[No. 1565.]

# FRANK PAUL, RESPONDENT, *v.* ROCCO CRAGNAZ, APPELLANT.

PRACTICE ON APPEAL—RECORD—IRRELEVANT PAPERS. Papers sent up on appeal, other than those which the statute specifies shall constitute the record on appeal, should be stricken out on motion.

IDEM—NOTICE OF APPEAL—CLERICAL ERROR. Appellant's notice of appeal from an order denying a new trial recited that the order appealed from was made and entered on the 11th day of May, whereas the order was made and entered on the 10th day of May: *Held,* that the notice was sufficient.

IDEM—UNDERTAKING—CLERICAL ERROR. The undertaking filed on an appeal from an order dated May 10th, denying a new trial, referred to the order as having been made and entered May 11th: *Held,* not ground for dismissing the appeal, where the undertaking otherwise clearly identified the order appealed from, and the mistake was simply a clerical error.

IDEM—IDEM—TIME OF EXECUTION AND FILING. Since the execution of an undertaking on appeal is not complete until it is delivered by filing it with the clerk, the fact that an undertaking was prepared and completed, ready for filing, before the notice of appeal was filed, does not render it insufficient when it was not actually filed until the proper time after the notice of appeal was filed.

IDEM—STATEMENT—EXCEPTIONS. Where the statement of the case does not show that the errors complained of were reserved by objections or exceptions at the trial, they will not be considered on appeal.

LEASE—FORM OF. Plaintiff brought action as lessee of the owners of an undivided one-third interest in a mine, under an instrument which recited that it leased unto plaintiff a one-third interest in the mine for one year, "the provisions of this lease to be as follows: The party of the second part hereby agrees to work said mine in a workmanlike manner, and to pay the party of the first part royalty from all ores taken out * * * from the mine by the party of the second part, during the continuance of this lease": *Held,* that the instrument was a lease granting an undivided one-third interest in the mine for the term of one year, and was not a mere license.

OUSTER—RIGHT OF POSSESSION OF LESSEE OF COTENANT. Defendant, the owner of an undivided two-thirds interest in a mine, refused to permit plaintiff, who was his cotenant's lessee, to enter into possession of the mine, or to permit him to work the mine at a different level from where defendant was working, and threatened bodily injury to plaintiff if he entered the tunnel leading to the ore bodies then developed: *Held,* sufficient to support a finding of an ouster of plaintiff by defendant.

Points decided.

IDEM—IDEM—RIGHT OF ACTION—ACCOUNTING—DAMAGES. Where plaintiff was lessee of an undivided one-third interest in a mine under a lease from the owners of said interest, and the defendant, who was the owner of the remaining two-thirds interest, refused to permit him to enter into possession and work the mine, or any part thereof, plaintiff was not confined to an action for an accounting of the profits received by defendant during the term of the lease, but could maintain an action against defendant for damages, based on loss of profits that plaintiff would have made but for the ouster.

DAMAGES—PROBABILITY OF PROFITS. In an action against the owner of an undivided two-thirds interest in a mine for excluding a lessee of the other undivided one-third interest therefrom, where it was shown that plaintiff was a practical miner, and that there was reasonable probability that he would have mined sufficient ore during the term of the lease to have yielded him a profit of about $14,000 had he been permitted to work the mine as he proposed and intended to do, a verdict for $2,287 50 was not excessive.

IDEM—IDEM—TENANT IN COMMON—OUSTER. A tenant in common, when ousted by his cotenant, may recover damages resulting from the ouster, and, in determining the amount of damages, profits, when not entirely speculative, may be taken into account, and it is only required that they be ascertained with a reasonable degree of certainty. (BELKNAP, J., dissenting.)

## ON PETITION FOR REHEARING.

MINES—JOINT TENANTS—EVIDENCE OF VALUE OF ORE—NON-SUIT. In an action by a lessee of the owner of an undivided third of a mine to recover damages from the owner of the remaining interest therein for his refusal to allow him to work the mine, a motion for a nonsuit upon the ground that all the evidence as to the amount of ore mined prior and subsequent to the term of plaintiff's lease was stricken out, was properly denied where it does not appear from the record that all of such testimony was stricken out, and where the defendant has assigned as error the refusal of the court to strike out all the testimony of a certain witness "concerning ores mined on leases prior or subsequent to plaintiff's lease," and where it appeared that ore was mined by defendant during such term at a profit, and where it is admitted by the pleadings that the defendant, during the plaintiff's term, had mined ore of the value of $10,000.

IDEM—DAMAGES—PROFITS—PROSPECTIVE AND ESTABLISHED BUSINESS. In an action by a lessee of the owner of an undivided third of a mine to recover against the owner of the remaining interest for his refusal to allow him to work the mine, defendant's contention that plaintiff could not recover for loss of profits he might expect to have derived therefrom, for the reason that the business was prospective and not established, was without merit, it appearing that the mine had been worked previous and subsequent to the term of the lease at a profit, and had yielded a desirable product.

PRACTICE ON APPEAL—ORAL INSTRUCTIONS—EXCEPTIONS. A general exception to an entire oral charge is unavailable on appeal, where one of the instructions forming a part of such charge was correct.

MINES—JOINT TENANTS—PARTITION—LESSEE.  Where defendant's right to
a partition of a mining claim, which he owned as a cotenant with
plaintiff's lessor, was not involved in an action by plaintiff to recover
damages for defendant's refusal to allow him to work the mine
under a lease of an undivided third interest of the owners, an objec-
tion that the lease was void because it would prejudice defendant's
right to a partition will not be reviewed on appeal.

IDEM—IDEM—LESSEE—DAMAGES—PROSPECTIVE PROFITS.  Where the lessee
of an undivided interest in a mine sued the lessor's cotenant for
refusal to allow him to work the mine during the term of a lease
which had expired, such action was not to recover for the loss of
prospective profits, but for damages then accrued.

APPEAL from the Fourth Judicial District Court, White
Pine County; *G. F. Talbot,* Judge.

Action by Frank Paul against Rocco Cragnaz. From
a judgment for plaintiff, defendant appeals. Affirmed.
Rehearing denied.

The facts sufficiently appear in the opinion.

*Robert M. Clarke, Peter Breen, A. E. Cheney* and *O. J. Smith,*
for Appellant:

I. The legal effect of the contract of plaintiff with Howell
and others is to be determined by the instrument itself, and
not by any name or description which may have been given
to it. It is called a lease in the record, but whether it is
such, and what rights the parties thereto have under it, must
be ascertained from the instrument itself and its language
and terms. (2 Lindley on Mines, 860; Wood, Landlord and
Tenant, p. 299.)

II. The agreement of June 13, 1896, between Paul and
Howell, *et al.,* is not a lease, but a contract or license to work
at Paul's option as to the amount of work to be done, upon
certain mining property for the period of one year at a spec-
ified royalty of one dollar per ton on such ores as he might,
perchance, extract. It does not contain the following essen-
tial elements of a lease: (1) It does not purport to give
the possession of any defined property. (2) It does not
purport to give the exclusive possession of any property or
interest. (3) The payment of rent is optional, and depends
upon the fact as to whether the plaintiff mines any ore; and
gives no right of action to the other parties to the contract if

plaintiff does not mine at all. (4) There is no estate, interest, or possession, which will revert to the lessors upon the termination of the term. The contract is a license to work, and not a lease, and confers no right of action, except to the extent that it has been executed. (2 Lindley on Mines, 860–861; *Hudepohl* v. *Liberty Hill Co.*, 80 Cal. 553, 558; *Stuart* v. *Adams*, 89 Cal. 367.) Paul's rights under this contract are similar to those of a "cropper." (8 Am. & Eng. Enc., 2d ed., pp. 324, 325.)

III. Whatever may be the nature of the agreement, this defendant is not a party thereto; and while it may be the measure of the rights and liabilities of the parties who signed it, it cannot limit or restrict the estate, rights, or possession of Cragnaz in his own property, or be any measure of damages for a refusal on his part to comply with the privilege which Howell, *et al.*, had given to Paul. As to Cragnaz the contract is *res inter alias acta*, and without force or effect. (Freeman on Cotenancy, sec. 249a; *Murray* v. *Haverty*, 70 Ill. 318, 320; 11 Am. & Eng. Enc., 1st ed., p. 1095e; *Boston Franklinite Co.* v. *Condit*, 19 N. J. Eq. 394, 400, 401; *Adam* v. *Briggs Iron Co.*, 7 Cush. 361, 368, 370; *Holcomb* v. *Coryell*, 3 Stockt. 548.)

IV. Cragnaz not being affected by the terms of the contract between Paul and Howell, *et al.*, it becomes pertinent to consider the relations between Cragnaz and his cotenants. Whatever Paul's rights may be under the contract, as between the parties thereto, it is certain that as against Cragnaz, Paul has no greater right than Howell, *et al.*, the cotenants of Cragnaz. Under the common law, Cragnaz would not be responsible to his cotenants for any part of the rents, issues and profits, unless he had received such from third parties (Freeman on Cotenancy and Partition, secs. 274, 275; *Pico* v. *Columbet*, 12 Cal. 414), except he ousts them, and then their remedy would be by partition and an accounting. Some American cases hold that he would be liable to his cotenants for their share of the reasonable rental value of the property. (*Early* v. *Friend*, 16 Gratt. 21, 78 Am. Dec. 649, see notes p. 665, *et seq.*) In the absence of a statute giving the right of action, one cotenant, refused possession of the common property by a cotenant, cannot maintain ejectment.

(*Brown* v. *Warren*, 16 Nev. 228; *Sharon* v. *Davidson*, 4 Nev. 416). There is no such statute in this state; and had Cragnaz refused Howell, *et al.*, the same as he did Paul, they could not have sued for damages, but would have been confined to an action for partition, or an accounting of the rents and profits received by Rocco Cragnaz. Each has the same right of possession, and neither has the exclusive right which justifies ejecting the other. (*Hoopes* v. *Meyer*, 1 Nev. 433, 445.)

V. The liabilities of cotenants to one another are thus summarized by Judge Freeman: "All the claims which one cotenant may present against another, not founded upon any special agreement, and arising out of the subject of the cotenancy, are: First, for use or occupation of the common property; second, for profits received from the common property; third, for services performed or moneys expended for its benefit; fourth, for damages occasioned to it by the willful act or culpable negligence of the cotenant from whom redress is sought." (Freeman on Cotenancy and Partition, chap. XII, p. 343.)

VI. A cotenant in possession is only accountable to his cotenants as stated above. The law does not require him to operate the common property, nor does it hold him liable for what he might have realized had he worked the common property prudently and vigorously. It is his property to the extent of his undivided share, and the law does not attempt to direct or compel him to develop it. If the common property is not worked, the estate of his cotenant is not impaired nor damaged, in case the common property is a mining claim. In this particular case the estate of the Cragnaz cotenants in the Homestake mine was much benefited by letting the property lie idle during the months when lead was only worth $2 50 per 100 pounds, and when it could not have been worked at a profit.

VII. The law encourages the development of a mining claim, owned by tenants in common, by holding the tenant who works it only to a division of the profits actually realized—that is, taking the most favorable view as to the rights of a cotenant out of possession that has been expressed by any court. (*Thompson* v. *Bostick*, 1 McCull's Eq. 75; *Holt* v. *Robertson*, Id. 475.) The law does not attempt to say which

of the cotenants could have made the most money by work-
ing the claim.   This right of common possession and indi-
vidual interest is the result of contract—of their own act;
and if their tenure and estate is unsatisfactory by reason of
the incidents arising from its nature, the remedy of the ten-
ants in common is to convert the undivided common estate
into separate individual estates by partition.   The law does
not attempt to say, in the absence of statutory authority,
which has the better right to possession, nor to enforce a
judgment putting one into possession of that which is right-
fully in the possession of another.

VIII.   The court erred in refusing defendant's motion for
a non-suit.   All evidence of ore mined prior to the contract
has been stricken out, and the evidence of ore mined subse-
quent to the contract was permitted to remain only for the
purpose of qualifying witnesses to testify about matters
which it appears they never did testify concerning.   The
non-suit should have been granted, because there was no
evidence before the court that the plaintiff had been dam-
aged in any sum whatever, by any act of the defendant, or
that plaintiff had sustained any damage whatever from not
working the mine during the term of the contract.

IX.   The court erred in instructing the jury that the
measure of damages which Paul was entitled to recover from
Cragnaz was the profits which he could have made if he had
been permitted to work the mine.   Profits which are purely
prospective and speculative, dependent upon the result of a
mining venture, the number of men employed, the ability
and luck to find new bodies of ore, the market value of lead
and silver, is too uncertain and unreliable to constitute a
measure for legal damages.   ( *Watt* v. *Nevada Cent. R. R. Co.,*
23 Nev. 174, 175; *Clark* v. *Nevada L. & M. Co.,* 6 Nev. 203;
*Brigham & Co.* v. *Carlisle,* 78 Ala. 243; *Howe Machine Co.* v.
*Bryson,* 44 Iowa, 159; *Giaccomini* v. *Bulkeley,* 51 Cal. 260;
*Martin* v. *Dietz,* 102 Cal. 56; *Bridges* v. *Lanham,* 14 Neb. 369,
45 Am. Rep. 121; *Red* v. *Augusta,* 25 Ga. 386; *Cushing* v.
*Seymour,* 30 Minn. 304; *Griffin* v. *Colver,* 16 N. Y. 490;
*McDaniells* v. *Crabtree,* 21 Ark. 431; *Brock* v. *Gale,* 14 Fla.
523; *McBoyle* v. *Reeder,* 23 N. C. 607; *Sledge* v. *Reid,* 73 N. C.
440; *Vicksburg Co.* v. *Ragsdale,* 46 Miss. 458; *Abbott* v. *Gatch,*

13 Md. 333; *Sitton* v. *McDonald,* 25 S. C. 68; 60 Am. Rep. 484; *Frazer* v. *Smith,* 60 Ill. 145; *Barnard* v. *Poor,* 21 Pick. 380; *Hunt* v. *Hoboken Land Co.,* 3 E. D. Smith, 144; *Taylor* v. *McGuire,* 13 Mo. 517; *Jones* v. *George,* 56 Tex. 149; 61 Tex. 345; *Houston Ry. Co.* v. *Hill,* 63 Tex. 381; *Howard* v. *Stillwell Mfg. Co*, 139 U. S. 204; *Pennypacker* v. *Jones,* 106 Pa. St. 237, 242.)

X.   The condition of affairs, at the time Cragnaz refused to permit Paul to work with him, must determine the damages sustained.   At that time Paul had nothing to damage. No work had been performed.   He had incurred no liability in preparation, or contemplation, of the work which he claims he proposed to do.   He had no business to be interrupted, and no profits could possibly accrue from what he had then done.   Where profits to business are allowed as damages, it is where there is an existing business at the date of the alleged wrong, which is injured by the act of the defendant; where there is an injury to a going concern, not to an enterprise which may afterward be started; where it is something *in esse,* and not something *in posse,* which is damaged. (*Clark* v. *Nevada L. & M. Co.,* 6 Nev. 203; *Wolcott* v. *Mount,* 36 N. J. L. 271; .13 Am. Rep. 438; *V. & M. R. R. Co.* v. *Reynolds,* 46 Miss. 484; *Goebel* v. *Hough,* 26 Minn. 252; *Chapman* v. *Kirby,* 49 Ill. 211; *Houston Co.* v. *Hill,* 63 Tex. 381; 51 Am. Rep. 642; *Paola Gas Co.* v. *Paola Glass Co.,* 56 Kan. 614; *Penn. Ry. Co.* v. *Dale,* 76 Pa. St. 47.)

XI.   The damages awarded by the jury are excessive and vindictive, and wholly without evidence to support them. There was no proof of the amount of ore that Paul would have mined; the number of tons that he could have removed; the number of men that he would have employed, or could have employed profitably; the cost of removal at that time; the value of the ore then known to exist; or the profit per ton or in gross.   It does appear that there was only a small quantity of ore in sight, at the time the agreement was made with Paul.   After that was worked out, new ore bodies had to be discovered.   Now, it does not by any means follow, with such reasonable certainty as to be entitled to form a basis of damages, that Paul would have discovered the same ore that others did.   It is a matter of common knowledge

that one person will work a mine profitably where another has made a complete failure; that one will solicit trade successfully, and another not pay his running business expenses. It is because of the inherent difficulty and impossibility of giving due weight to the elements of personal ability, changed conditions, and fluctuating markets, that the law does not undertake to measure such imaginary and prospective damages.

XII. There is no pretense that more than one order was ever made overruling the defendant's motion for a new trial. The mere clerical error of one day in stating in the notice of appeal, and undertaking on appeal, the time when the order was made will be disregarded. "The tendency of the court, as indicated by recent decisions, is to construe notices of appeal liberally and hold them sufficient, if by fair construction or reasonable intendment the court can say that the appeal is taken from the judgment in a particular case." (*Bliss* v. *Grayson*, 24 Nev. 422, 56 Pac. 231.)

XIII. The contention that the undertaking on appeal is invalid, because the sureties thereunto are not bound, is not well taken. They are estopped by the recitals of the undertaking from questioning whether an appeal was in fact taken. (2 Herman on Res. Adj. and Estoppel, sec. 633, p. 771; *Bowers* v. *Beck*, 2 Nev. 139; *State* v. *Rhoades*, 6 Nev. 352; *McMillan* v. *Dana*, 18 Cal. 339; *Smith* v. *Fargo*, 57 Cal. 157.)

XIV. Had the cotenants themselves demanded possession, or to be let into possession, and Cragnaz had refused them, they could have converted their estate into estates in severalty by partition, and have recovered from Cragnaz their proper share of the rents and profits from the date of the refusal; but they would not have been entitled to damages for any greater sum than their share of the rents and profits actually realized by Cragnaz. It must be perfectly clear, in any view of the case, that Paul could not have a right to recover a greater sum than his licensors could have recovered. Paul could not eject Cragnaz (*Hoopes* v. *Meyer, supra*) from the possession of the mine, nor could he maintain an action against him to be put in possession; neither could he maintain an action for partition against Cragnaz. (*Smith* v. *Cooley*, 65 Cal. 46.) If Paul had no title in his capacity as

licensee on which he could maintain either ejectment or partition as against Cragnaz, how did he have any title on which he could base an action for damages?

*Thos. Wren* and *F. X. Murphy*, for Respondent:

I. This case was tried on the 28th day of November, 1898. In due time appellant filed and served a notice of motion for a new trial, and thereafter filed a statement on motion for a new trial, to which respondent filed amendments. The statement was afterwards settled by the court and engrossed, and agreed to as engrossed by the attorneys of the respective parties. On the 10th day of May, 1899, the court overruled the motion for a new trial and on the 2d day of June of said year appellant filed and served a notice of appeal from an order made on the 11th day of May, 1899, overruling a motion for a new trial. On the same day appellant filed an undertaking which recited that the defendant, Rocco Cragnaz, has appealed to the Supreme Court of the State of Nevada, from the order of said district court denying and overruling defendant's motion for a new trial, which said order was made and entered on the 11th day of May, 1899. This undertaking was executed on the 29th day of May, 1899, four days before the notice of appeal was filed and served. The bond further recited that the sureties undertook and obligated themselves on the part of the appellant to the effect that the said appellant will pay all damages and costs which may be awarded against him on the appeal, etc. At that time there was no appellant and no appeal. There was no notice of appeal from the order overruling the motion for a new trial made May 10, 1899, and there is no undertaking on appeal from that order, and the appellant had not appealed at the time the undertaking was executed.

II. The method of taking appeals is purely statutory. (*Burbank* v. *Rivers*, 20 Nev. 81; *Gaudette* v. *Glissan*, 11 Nev. 184.) The sureties on the undertaking would not be liable if it had been given upon an appeal from the order in this case. (*Carson Opera House Ass.* v. *Miller*, 16 Nev. 337–340.) The undertaking should not have been executed before the notice of appeal was filed. (*Johnson* v. *Badger M. Co.*, 12 Nev. 261; *Reese M. Co.* v. *Rye Patch M. Co.*, 15 Nev. 341;

*Lyon Co.* v. *Washoe Co.,* 8 Nev. 177.)   The cases last cited are to the point that the undertaking must be filed after or at the time the notice of appeal is filed, but the present case is strictly analogous to a case where the undertaking on appeal is filed prior to the filing of the notice of appeal.   The appeal should be dismissed.

III.   As we understand the law, a cotenant out of possession has a right to recover for his share of the profit made by a cotenant in possession.   Of course, in ascertaining the profit, the amount justly chargeable against the cotenant out of possession for the expenses of development and mining must be deducted from the gross proceeds received by the cotenant in possession.   It is true, aside from statutory regulation, the cotenant in possession cannot compel the cotenant out of possession to bear any part of the loss that he may sustain should his risk not be remunerated, but he is not compelled to take the risk, and, if he desires to work upon the claim exclusively for his own benefit, he may have his portion set apart to him by taking the proper steps under our statute; but whether equitable or inequitable, this, we submit, is the law.   The lessee of the tenant in common occupies the same position towards the cotenant of his lessor that the lessor does.

IV.   The possession of one tenant in common of the common property until some act is committed by the cotenant that amounts to an ouster of the other tenants in common is a rule so familiar that no citation of authorities is necessary. "Any act of a cotenant in the exclusive possession, which manifests an intention on his part to hold exclusively for himself, is equivalent in law to an actual ouster." (*Owen* v. *Morton,* 24 Cal. 373; *Carpentier* v. *Webster,* 27 Cal. 524; *Carpentier* v. *Mendenhall,* 28 Cal. 484; *Carpentier* v. *Gardiner,* 29 Cal. 160; *Spect* v. *Gregg,* 51 Cal. 198; *Packard* v. *Johnson,* 51 Cal. 545.)

V.   The acts alleged in the complaint were sufficient to establish an ouster.   What would have been the remedy if appellant had ousted Clarke and Mrs. Robinson?   The old common law action of ejectment has been abolished in this state with its absurd fictions, although for convenience the name is still retained.   Where one tenant in common is

ousted by a cotenant he may maintain an action of eject-
ment to recover possession of the undivided interest in the
common property.  (*Owen* v. *Morton*, 24 Cal. 373; *Carpentier*
v. *Webster*, 27 Cal. 524; *Carpentier* v. *Mendenhall*, 28 Cal. 484;
*Carpentier* v. *Gardiner*, 29 Cal. 160; *Spect* v. *Gregg*, 51 Cal.
198; *Packard* v. *Johnson*, 51 Cal. 545.)   A tenant in com-
mon may maintain an action for damages from a cotenant
by whom he has been ousted.  (*Carpentier* v. *Mitchell*, 29
Cal. 330.)

VI.   The instrument executed by Howell, Clarke and Mrs.
Robinson is a lease.  (Anderson's Dict. Law, title "Lease,"
p. 606, and authorities cited in foot notes.)   By the lease
respondent was subrogated to the rights of the lessor and
may maintain his action for damages against the appellant.
A tenant who is ousted may maintain ejectment and an
action for damages.  (Estee's Pleadings, vol. 2, sec. 2270–
2272.)   In short, the tenant during the life of his lease has
the same right to the quiet possession and enjoyment of the
interest leased, as his landlord would have if the interest
had not been leased.   He may maintain an action for the
possession of the leased premises and for damages if ousted,
and if ousted during the life of his lease.   After the expira-
tion of his term he may maintain an action for damages
against any one who may have ousted him during the term.

VII.   In a case like this, arising under a lease of a mining
claim, it is not an easy matter to determine what damage a
lessee who is ousted sustains by reason of the ouster.   Ordi-
narily there is but one way of determining the value of a
lease of this character, and that is by showing the profit
made by other lessees of the same property at or near the
same time, the conditions being practically the same.   Unless
the value of a lease of this species of property can be deter-
mined in this way, the lessor, by ousting the lessee and shut-
ting the mine down, can deprive the lessee of any remedy
whatever for the wrong.   It is an axiom of the law that
there is a remedy for every wrong, which I apprehend is true
unless a case of this kind is an exception.   In this case it
was clearly established by proof that a large amount of ore
had been taken out of this mine prior to the lease to
respondent.

IX.   One tenant in common has a right to the possession and enjoyment of each and every part of the common prop-erty.   (*Tevis* v. *Hicks*, 38 Cal. 234; *Carpentier* v. *Webster*, 37 Cal. 524.)   The appellant had no more right to exclude the respondent from working on the ore body that appellant was at work upon than he had to exclude him from any other portion of the mine.   Counsel for appellant have contended throughout the case, and still contend, that the lease did not bind the appellant.   This seems to us to be a very remarka-ble view to take of the case.   In one sense the appellant not being a party to the lease was not bound by it, but he was bound to let his cotenants into the possession of every part and parcel of the mine upon application and upon refusal he would become liable for any damages they might sustain by reason of the ouster.   By the lease Paul was subrogated for one year to the same right.

X.   The only other point made by counsel for appellant that seems to require any discussion, at present at least, is in regard to prospective damages.   A number of authorities are cited by counsel for appellant upon this point, and amongst them *Clark* v. *Nevada M. Co.*, 6 Nev. 203.   In that case the court say:   "Prospective damages in an action like the present are allowed only upon proof that they are reason-ably certain to occur."   It follows, of course, that prospect-ive damages may be allowed if they are reasonably certain to occur.   In this case, however, we were not asking for pros-pective damages, but for damages that it was alleged had occurred.   The proof, we submit, is clear and convincing that respondent could have and would have made a profit by working the mine during the term of his lease, not only of twenty-five hundred dollars, but probably of eight thousand dollars.

XI.   A tenant in common who is excluded from the com-mon property by a cotenant can maintain ejectment and couple with it a claim for damages and that a lessee of a cotenant acquires the same right and that the lessee, after his lease has expired, can maintain an action for damages alone.   (Estee's Pleadings, vol. 2, sec. 2270, form 548; *Roe* v. *Doe*, 30 Ga.)   The only damages a lessee can recover, in an action like the present one, is the profit he could have

made if he had been permitted to work upon the mine. Unless this be so, he is absolutely without remedy.

.XII. The testimony fully sustains the verdict. The respondent proposed to appellant to sink a shaft on the Homestake where one was subsequently sunk by Muir and others. This appellant refused to do or to permit respondent to do. Muir and the others, who leased the mine from appellant almost immediately after the lease of respondent expired, sunk the shaft at the spot that respondent proposed to appellant and within the year made $4,000 apiece. Counsel for appellant attempt to meet this point by showing that lead was low a portion of the year respondent's lease had to run. The proposition of respondent to appellant was to hold the ore for higher price. The ore was there, just as the crop was in the case cited by counsel from the supreme court. The price did rise and the profit that respondent could have made by ordinary labor and diligence is not at all conjectural; in regard to the instrument, it is a lease, pure and simple, of the mine not by metes and bounds, and for the use for which it was adopted, respondent contracting to work it in a workmanlike manner. Respondent not only agrees to work it but agrees to work it in a workmanlike manner. There is no limitation in time short of the time for which the mine was leased.

## ON PETITION FOR REHEARING.

*A. E. Cheney* and *Oscar J. Smith*, for Appellant:

I. Defendant, after plaintiff had introduced testimony in his behalf, moved the trial court to strike out all testimony of ore, prior or subsequent to plaintiff's lease. The court denied this motion, but permitted the "evidence to stand only for the purpose of qualifying witnesses to show condition, character and value of ore at the time of the lease." It will be seen, on page 65, that Mr. Clarke, for the defendant, objected to the question: " How many tons of ore did you take out under that lease?" This objection was overruled on Mr. Wren's offer, for the plaintiff, that it is for the purpose of "qualifying the witness about the ore value, quality, conditions and character, during defendant's lease." This action of the court permitted the testimony to stand simply

for the purpose of qualifying witnesses to testify as to the condition, character and value of ore, at the time of the lease. It will readily be seen that there was left no evidence as to any damage of any kind, nature, or description, nor was there any evidence on which the jury could base a verdict for the plaintiff. The plaintiff rested. Defendant presented his motion for non-suit in writing. The motion for non-suit was denied, and an exception duly noted by the defendant.

II. The point made by the appellant in his opening brief, and which seems to have been overlooked, is that there is a material and recognized distinction between profits to an established business and a prospective one, and that evidence of actual loss by interruption of an established business may be recovered, while prospective loss, for a business to be entered into, is denied. The authority upon which the court relies (*City of Terre Haute* v. *Hudnut*, 112 Ind. 587) expressly recognizes and enforces this distinction. The Supreme Court of Indiana had previously decided that future prospective profits were not sufficiently definite and certain to be a measure of damages, and *City of Terre Haute* v. *Hudnut* does not overthrow, but, on the contrary, expressly recognizes that decision as being correct. When applied to a business *in futuro*, an enterprise, not a going concern, such anticipated profits, or evidence of what they would have been, is rejected as too remote and speculative. Indeed, immediately following that portion of the opinion which is quoted in the majority opinion herein, the Supreme Court of Indiana repeats the point that the rule is confined to a present established business. True, the rule is more liberal in actions for tort than actions *ex contractu*. But *Clark* v. *Nevada M. Co.*, 6 Nev. 203, and *Watt* v. *Nev. Cent. R. R. Co.*, 23 Nev. 154, are each actions to recover damages for a tort, yet each held that future prospective damages are too uncertain to form a base for recovery. It is difficult for the appellant to understand why the loss of crops thereafter to be grown was not quite as certain and probable an element of damages in *Clark* v. *Nevada M. Co.* as the loss of profit on ore thereafter to be mined, when the profit depended entirely on the continuance of the ore then in sight and the market price of lead.

III. The reason of the rule is manifest; one has as a basis that which is, the other has no foundation except that which may be. Another reason why this rule is unjust is manifested by this case. Paul, assuredly, had no greater right than Howell and Clarke, and a denial of his right to work the mine can give him no greater right of recovery than they would have. Strictly speaking, there is no analogy between rent and royalty. One is for the use and occupation of property, the property to be returned *in statu quo;* the other contemplates the destruction and despoliation of the estate itself.

IV. *Exceptions to Instructions:* Without considering the fact that the decision in *McGurn* v. *McInnis,* upon the point of the sufficiency of an exception to an instruction, was entirely outside of any question necessary to be decided, the attention of the court is requested to the manifest difference between the facts of that case and this one, especially as to the oral charge given by the court. The rules of the district court require instructions to be settled before the argument of the case begins. It may well be said that thereby counsel has the means to know in time and specify his objections to an instruction which the court gives. But counsel does not know what an oral charge will be until it is given and the mischief is accomplished. It must be known to the members of this court that oral instructions have been the exception to the general practice, and that in fact little or no opportunity is given to make or specify the point of the exception, and also that any action taken, at such a time, in the presence of the jury, after the argument of the case is closed, tends to create an impression with the jury that the court's instructions are against the claim of the party objecting, and such action is therefore harmful. But in this instruction the record shows that the appellant did except to the oral charge of the court, for the reason that it did not correctly state the law applicable to the case. It is submitted that, as far as the oral charge of the court is concerned, the rule of *McGurn* v. *McInnis* ought to be applied and the objections heretofore presented to that charge should be considered.

V. Paul's license or lease prejudiced Cragnaz's right to a

partition, and for that reason, if for no other, was void. In our original brief herein we tried to make it clear to the court that Paul's so-called lease was void, because it "would prejudice the rights of the cotenant (Cragnaz, the defendant herein) to a partition," and to that end we cite *Boston Co.* v. *Condit,* 19 N. J. Eq. 394, 400, 401; but a careful perusal of the majority opinion fails to show us wherein the court has taken any notice of this view of the case, and hence assume that it may have been overlooked. The court did consider Paul's rights to a partition, but does not seem to have looked at the possible rights that Cragnaz might have had. Whether a partition would be advisable, or whether it would not, and whether, "on account of the scarcity of bidders, and the smallness of the amount bid," a partition would have been advantageous to Cragnaz, or Paul, or Howell, or Clarke, or Mrs. Robinson, or otherwise, still he (Cragnaz) must have been clearly entitled to convert his joint estate into an estate in severalty by partition under statutory proceedings. (Gen. Stats. 3288.) Now, let us assume that, when Paul presented his contract and demanded possession, Cragnaz immediately desired to partition the property, and, if necessary, to have it sold and the proceeds divided as the statutes provide, and to that end had instituted proceedings: against whom would he have proceeded? Surely not against Paul, as they did not hold the same kind and character of estates in the property; and moreover, by the time he could possibly have secured a final judgment in the event of contest, the term of Paul's contract would have expired, and Cragnaz would have accomplished nothing by his expensive and tedious litigation, and would have it all to do over again if his cotenants had seen fit to give Paul another contract for another year, and so on. On the other hand, had Cragnaz commenced his partition proceedings immediately against Howell, Clarke, and Mrs. Robinson, or even against them and Paul, too, then and in that case it would have availed him nothing as against Paul's rights under the contract, who, it would seem from the opinion referred to, would under any circumstances have been entitled to damages for Cragnaz's refusal to permit him to work.

By the Court, Bonnifield, C. J.:

This action was brought to recover damages of the defendant for refusing to permit the plaintiff to enter into the possession of a certain mining claim and work the same, and for excluding him therefrom. The plaintiff based his right to enter into possession and work said claim upon a written lease, executed to him, for an undivided one-third interest in said claim by the owners of said interest, the defendant owning an undivided two-thirds interest therein. The trial resulted in a verdict of the jury in favor of the plaintiff for $2,287 50, and a judgment accordingly. This appeal is from an order denying defendant's motion for a new trial.

The respondent moves the court to strike out each of twenty-three papers, designated by name, which are found in a package of papers certified to be the whole record on appeal. This motion is granted. These papers constitute no part of the record on appeal. The practice of gathering up all the papers and documents filed in a case in the trial court, and sending them up on appeal, mixed with or attached to the record, when they constitute no part of it, should be discontinued. The statute clearly specifies what papers shall constitute the record on appeal in every appealable case. There is no authority for withdrawing any other papers from the files of the trial court for the purposes of an appeal. A party may be subjected to unnecessary costs by filing useless papers on appeal, as the fee of the clerk of the supreme court is 30 cents for filing each paper, and for entering each order of the court $1 50.

In the notice of appeal it is recited that the defendant hereby appeals to the supreme court "from the order overruling and denying defendant's motion for a new trial in said action, which said order was made and entered on the 11th day of May, 1899." The record shows that the order denying defendant's motion for a new trial was made and entered on the 10th day of May, 1899, instead of the 11th day of said month. Respondent moves for a dismissal of the appeal upon certain grounds named. One ground is to the effect that no appeal has been taken from the order made

and entered on the 10th day of May denying the defendant's said motion.

In *Weyl* v. *Sonoma Valley Railroad Co.*, 69 Cal. 202, 10 Pac. 510, the respondent made objection to the notice of appeal for the reason that the notice did not give the correct date of the entry of the judgment and order denying a new trial from which the appeal was sought to be prosecuted. The court held, in substance, that, as the record showed that there had been but one judgment and order of the kind appealed from entered in the case, the notice was sufficient, and that the mistake of dates merely should be regarded as a clerical misprision.

In *Anderson* v. *Goff*, 72 Cal. 65, 13 Pac. 73, the judgment appealed from was rendered on the 29th day of March, 1884, and entered on the 30th day of April following. The notice of appeal referred to the judgment as having been entered on the 29th of March, 1884. *Held*, that the notice was sufficient.

In *McAllep* v. *The Latona* (Wash.), 19 Pac. 131, the notice of appeal described the decree appealed from, which was rendered October 7th, as of October 1st. It not appearing that there was any other decree in the cause, the error as to the date was held not to be material.

It will be observed that the appeal is taken "from the order overruling and denying defendant's motion for new trial in said action." The date in the clause following, "which said order was made and entered on the 11th day of May, 1899," clearly appears to be a clerical mistake, as the record shows that the order in said case overruling the motion was made and entered on the 10th day of May, 1899. It does not appear, nor is it claimed, that there was more than one order made on the motion. We are of opinion that said notice of appeal is sufficient.

Another ground alleged for the motion to dismiss is that no undertaking was filed on an appeal from said order of May 10th. We do not think this contention is tenable. The undertaking refers to the order appealed from as " the order of said district court denying and overruling defendant's motion for a new trial, which said order was made and entered on the 11th day of May, 1899." There being but one

order made and entered overruling and denying defendant's said motion by the district court, it is evident that the reference to the date thereof as the 11th day of May, 1899, instead of the 10th day of said month, was and is simply a clerical mistake, and does not vitiate the undertaking. We do not think that the mistake could avail the sureties as a defense in an action against them on said undertaking. (*Sweeney* v. *Karsky*, 25 Nev. 197, 58 Pac. 813.)

The third ground given for the motion to dismiss is that the undertaking was executed before the notice of appeal was filed. The statute requires that, to render an appeal effectual for any purpose, a written undertaking shall be executed on the part of the appellant, by at least two sureties * * *; that such undertaking shall be filed with the clerk within five days after the notice of appeal is filed. It is true that the undertaking was executed, in one sense, before the notice of appeal was filed—that is, it was prepared and completed ready for filing before said notice was filed—and, had it been filed before said notice, it would have been nugatory. But it is not required that the undertaking shall be thus executed within five days after the notice of appeal is filed, but simply that the filing thereof shall be made within that time. The execution of the undertaking was not completed until delivered. Its delivery was effected by filing it with the clerk.

The motion to dismiss is denied.

Counsel for appellant, in his brief, points out certain portions of several instructions given to the jury, makes certain specific points of objections to the same, and contends that the court erred in giving the said instructions. But the statement of the case does not show that any of said points of objections or exceptions were stated at the trial. The alleged errors cannot be considered on appeal. (*McInnis* v. *McGurn*, 24 Nev. 370; 55 Pac. 304, and cases cited.)

The defendant interposed a demurrer to plaintiff's complaint upon the ground that it does not state facts sufficient to constitute a cause of action. The court overruled the demurrer, and the ruling is assigned as error.

We do not think said ruling was error, but that the facts alleged are sufficient.

The facts, as shown by the complaint, stated in brief, are

that on the 13th day of June, 1896, the defendant and Irene
Robinson, Eugene Howell and R. M. Clarke were the owners
of a certain mining claim described therein, the defendant
owning an undivided two-thirds interest, and the said Rob-
inson, Howell, and Clarke owning among them an undivided
one-third interest in said mining claim; that on said day the
said owners of said one-third interest leased to the plaintiff
their said interest for one year from said date upon the terms
and conditions expressed in said lease; that the plaintiff on
the 18th day of June exhibited said lease to the defendant,
and offered to pay him any sum due from plaintiff's lessors
as their proportion of the expenses incurred in the develop-
ment of said mine; that defendant at said time, and at
divers other times about said date, refused to give any state-
ment of such expenses, refused to permit the plaintiff to
enter into possession and work said mining claim, and
excluded him therefrom; that the value of the rents, issues,
and profits of said one-third interest in said mine for the
said term of said lease is $3,000. It is alleged that by reason
of the refusal of the defendant to let plaintiff into possession
of said one-third interest in said mining claim under said
lease, plaintiff was damaged in the sum of $2,500. A copy
of said lease is attached to the complaint, and made a part
thereof.

Counsel's first contention with respect to the facts alleged
is that the writing called a " lease " is not a lease, but simply
a license to plaintiff to extract and work ore at his option
for the period of one year at a specified royalty on ores that
he might perchance extract. The instrument in question,
after giving the names of the parties thereto, respectively, as
the party of the first part and the party of the second part,
recites that they " do by these presents covenant and agree,
and the said party of the first part hereby leases unto the
said party of the second part one-third interest in and to
that certain mine known as and called the ' Homestake
Mine,' situated," etc.; " this lease to take effect and go in
force from this day, and to continue for a period of one year
up to and including June 13, 1897. The provisions of this
lease to be as follows: The party of the second part hereby
agrees to work said mine in a workmanlike manner, and

leave the same in as good condition as it is at this time. The said party of the second part agrees to pay to the said party of the first part or to  *  *  *,  as shall be directed by the party of the first part, royalty from all ores taken out, extracted, and shipped from said Homestake mine by the party of the second part during the continuance of this lease."

After specifying the amount of the royalty on each ton taken out, etc., it is recited, ' Said royalty to be paid upon the first day of each month to the party or parties as herein-before named." The instrument is dated the 13th day of June, 1896, and signed by the parties thereto.

"No particular form of words is requisite to make a lease. Any words that show an intention on the part of the lessor to divest himself of the possession of the premises, and confer it upon the lessee for a term, whether long or short, is suf-ficient; but the lessee should sign the lease, or in some man-ner become bound by such covenants as it is agreed that he shall perform."   (1 Wood, Landl. & Ten. 206.)

"A lease is a species of contract for the possession and profits of lands and tenements, either for life, or a certain term of years, or during the pleasure of the parties."   (12 Am. & Eng. Enc. Law, p. 976.)

"No particular form of expression or technical words are necessary to constitute a lease, but whatever expressions explain the intention of the parties to be that one shall divest himself of the possession of his property and the other shall take it for a certain space of time are sufficient, and will amount to a lease for years as effectually as if the most proper and permanent form of words had been made use of for the purpose."   (12 Am. & Eng. Enc. Law, p. 977.) In reference to leases of mines Lindley says: "As to whether an instrument is or is not a lease depends upon the intent of the parties, and not upon the mere form in which it is pre-pared."   (2 Lindl. Mines, 861.)

"Whether an instrument is a license or a lease will depend upon the manifest intent of the parties, gleaned from a con-sideration of its entire contents."   (2 Lindl. Mines, 860.)

We are of opinion that the writing in question, from a con-sideration of its entire contents, clearly and legally expresses

the parties' meaning, and shows an intention on the part of the lessors to divest themselves of the possession of the premises, and to confer it upon the lessee, the plaintiff, for the term therein named, and to obligate the lessee thereby to work said mine in a workmanlike manner during said term, and to pay the royalty monthly as therein specified. We are of opinion that said writing was a grant to the lessee of the lessor's undivided one-third interest in said mining claim for said term of one year, being their share of the whole of said mining claim or mine.

Counsel's further contention is that, whatever may be the nature of the instrument, it cannot limit or restrict the estate, rights, or possession of the defendant in his own property, and he cites several authorities to support this contention.

The answer to this is that said lease does not limit or restrict the defendant in any of his rights with respect to said mine or mining claim, his estate therein, or right of possession thereof.

The authorities cited are to the effect that it is not in the power of a tenant in common to convey the whole of the estate or the whole of a distinct portion by metes and bounds; that such conveyance is void as against the cotenants, but that the respective cotenants may convey their shares of the whole estate to one or many grantees, as they please, so the share be of the entire estate. As an illustration in one of the said cases cited, it is said: "I have a moiety. My cotenant has a moiety. He may convey a quarter of the whole estate to one, an eighth to another, a sixteenth to another, and so indefinitely, letting in other cotenants with me. But, all being seized of aliquot parts in the same estate, and of like kind and quality, my right to partition is not disturbed by the number of cotenants." (*Adam* v. *Briggs Iron Co.*, 7 Cush. 368.)

The lease in question is not a lease of the whole estate, nor the whole of a distinct portion by metes and bounds, but it is a lease from the three cotenants of their undivided one-third interest, being their share of the whole mining claim.

Counsel contends, as we understand, that if the defendant had excluded Howell, *et al.*, from the mine as he did the

plaintiff, they could not have sued for damages, but would have been confined to an action for partition of the common property, or an accounting of the rents and profits received by the defendant from third parties; and that, plaintiff having no greater rights than his lessors, he is confined to said remedies.

In *Carpentier* v. *Webster*, 27 Cal. 550, the court say: "Partition would afford no redress for the dispossession, whether total or partial. In the first place, the tenant expelled might not desire a partition, and it is possible that a partition would be equally unwelcome to the cotenant who expelled him. In the second place, partition does not lie between tenants in common at common law (2 Bl. Comm. 182, 191), and we are now treating the subject on common-law conditions only. And, in the third place, partition in equity is not for the purposes of redress for ouster, nor for any description of wrongs previously committed, but for the sole purpose of terminating the common tenancy. By the common law the ejected tenant was not only entitled to be restored to his moiety, but to damages also. (1 Coke, Litt., vol. 1, p. 906.) In chancery in partition cases there is no account taken of damages, but of mesne profits only. (1 Story, Eq. 466.)"

"In case of lodes and veins, it would seem impossible to effect a fair, actual division. It is a matter of common knowledge that the metallic substances occurring in veins are not distributed uniformly, either as to quantity or quality. They are found in 'shoots' or vuggs, kidneys, and other irregular bodies, making it impracticable to segregate the interests without great injury to the owners." (2 Lindl. Mines, 792.)

"It has been said that the only partition that can be made of this class of property is to order a sale, and divide the proceeds." (2 Lindl. Mines, 792.)

A sale in most instances would doubtless be equally as injurious to the owners as partition of the property, if not more so, on account of the scarcity of bidders and the smallness of the amount bid.

Partition being impracticable in most cases, and affording no redress for damages sustained by a cotenant by reason of

being ejected or excluded from the common property, if an accounting for the rents and profits received from third parties by a cotenant who did the ousting is the only remedy left the ousted cotenant for such redress, then a tenant in common, if he so elect, whether his moiety be great or small, may exclude all of his cotenants, to their great damage, from a mine, let the mine lie idle, or only work it himself, and incur no liability to his cotenants; for whether he let the mine remain idle, or only worked it himself, there would be no rents or profits to be received from third parties, and thus he may appropriate the whole profits, however great, to his own use.

There is no rule of law which grants a tenant in common such rights or privileges against a cotenant whom he ousts. The authorities are to the contrary. (*Gage* v. *Gage* (N. H.), 28 L. R. A. 829, note a.)

" If A disseize his cotenant, B, it is no defense in an action against him to recover rents and profits that in fact he has received or realized nothing from the lands during the dispossession, and B may recover what the rents and profits are worth, without regard to the inquiry as to whether A in fact collected rents or received profits." (*Sears* v. *Sellew*, 28 Iowa, 501.)

The said lessors, as tenants in common with the defendant, might have lawfully entered and worked said mine themselves if the lease had not been made.

" There can be no doubt that one, as a tenant in common, may authorize another to do what he himself could do with the common property." (*Alford* v. *Bradeen*, 1 Nev. 228.)

It is denied by the answer that the defendant refused to permit the plaintiff to enter into the possession of said mining claim and to work the same; denied that he excluded the plaintiff therefrom; denied that he refused to give to the plaintiff a statement of the expenses of the development of said claim; denied that the plaintiff offered to pay the defendant any amount due from his said lessors, or either of them, for their proportion of said expenses; denied that the value of the rents and profits of said one-third interest was any sum of money whatever; and denied that plaintiff was damaged in any sum by reason of defendant's refusal to let

plaintiff into the possession of said one-third interest under said lease, or for excluding him therefrom. But, in our opinion, there was sufficient evidence to support a finding of the jury in favor of the plaintiff on each of the above controverted points.

There was evidence to the effect that the plaintiff repeatedly requested of the defendant to be let into the possession of the mine, to work the same, and that defendant refused every request; that defendant threatened the plaintiff with personal violence if he entered and mined the ore; that he refused to permit the plaintiff to work on ore then accessible in the drifts, and on which no work was being done by any one; that the plaintiff requested that he be permitted to sink a shaft from the surface to the bodies of ore on their dip, below, outside, and away from the level on which defendant was working, and that he might extract the ore therefrom, and that defendant refused to permit him to do so; that there was no way of reaching the ore bodies then developed except through a tunnel from the surface and connecting incline; that the defendant locked the door that was at and in the mouth of the tunnel every night after the plaintiff got his lease, and that he threatened to scatter the plaintiff's brains if he entered there; that the defendant applied to the plaintiff insulting language and opprobrious epithets, and that the plaintiff did not enter and work the mine for fear that one or the other of them might get killed if he did so. The evidence was certainly sufficient to support a finding of the jury of an ouster of the plaintiff by defendant.

There was evidence sufficient to support a finding that the plaintiff offered to pay the defendant the lessor's proportion of all expense incurred by the defendant in any developments of the mine that he may have made. There was evidence, also, tending to show that the defendant had been fully reimbursed for all such expenses by the proceeds of ores extracted by the defendant from said mine. It appears that all of the work in developing the mine in that part where the defendant was working and from which the plaintiff was excluded as aforesaid was done by lessees of the mine, and that all the bodies of ore found there were found by such lessees.

It appears that the first lease was given by Eugene Howell
for a term commencing on the 14th day of January, 1894,
and ending on the 14th day of January, 1895 (Record, folio
137); that the lessees worked eleven months under ground
(folio 129); that they had ten or eleven men at work from
January to November, 1894, and then three men (folio 122);
that then a lease was given from January to August, 1895
(folio 120); that on this lease three men worked up to July
and five men during that month (folio 122); that during the
term of this latter lease the lessees discovered and developed
the ore body that defendant was working on when plaintiff
was refused possession; and that all the work defendant did
afterwards was on that body of ore (folio 126). If there be
any rule of law relating to the rights of tenants in common
with respect to the common property that would justify the
defendant in excluding the plaintiff from entering into pos-
session and working said mine, it has not been cited, and we
know of no such rule.

The contention of appellant that the damages awarded
by the jury are excessive and vindictive, and wholly with-
out evidence to support them, is the only remaining conten-
tion that we regard requires special consideration in this
opinion. Counsel asserts "that there was no proof of the
amount of ore that Paul would have mined, the number of
tons that he could have removed, the number of men that he
would have employed or could have employed profitably, the
cost of removal at that time, the value of the ore then known
to exist, or the profit per ton or in gross."

There was evidence to the effect that the plaintiff was a
practical miner of many years' experience in practical min-
ing; that mining was his business; that at the time he took
his lease the mine was in such condition, and such bodies of
ore had been and were then exposed in the underground
workings by other lessees, as to make it reasonably certain
that a large amount of ore could be extracted therefrom;
that it appeared to be reasonably certain from the extent of
these ore bodies in said workings and their dip that they con-
tinued downward out and beyond where the defendant was
working, and could be tapped by a perpendicular shaft if
sunk forty or fifty feet deep from the surface; that the plain-

tiff intended and proposed to sink such a shaft, and work the said ore bodies below the level on which the defendant was working, and raise the ore through the shaft; that other practical miners secured a lease on the ____ day of June, 1897, on said mine for the term of one year, sunk a shaft fifty-two feet deep at the place where the plaintiff intended to sink one, struck the said ore bodies, and mined therefrom 1,150 tons of ore during the term of their lease, with five men working four or five months and six men working the balance of said term. Besides, they took out 65 tons from the level above, or 1,215 tons in the aggregate.

From the above facts the jury might reasonably have found that there was reasonable probability that the plaintiff could and would have mined from 1,000 to 1,200 tons of ore during the term of his lease if he had been permitted to work as he proposed and intended to do.

It appears that the ores of the mine were valuable only for the lead and silver they contained; that 66 per cent was lead, and that there were twelve or thirteen ounces of silver per ton of ore; that on the market price of lead depended mainly the value of the ore; that the plaintiff could have sold all the ore he could have mined in 1896 at the rate of $3 30 per 100 pounds of lead contained therein.

It was agreed between the parties at the trial that when the market price of lead was $3 30 the ore was worth $18 34 per ton over and above cost of shipping to market, less the expense of mining and sacking the ore; that it required fourteen sacks to sack a ton of ore, and that the sacks cost 7 cents apiece, and miner's wages were $3 per day.

If the lessees in 1897 prosecuted the work every day, the wages of their men would be $6,030. If it required sufficient sacks to sack all the ore before any shipments were made, their cost would be $1,190. It appears from the evidence that two men could sack ten tons per day. Their wages for sacking 1,215 tons would be $732. These three items of costs of mining and sacking of 1,215 tons are figured at the highest possible cost that could have been incurred according to the evidence. It is not probable that the men worked every day in the year, or that it was necessary to have on hand so great a number of sacks to sack the ore. But, taking these items

as the necessary costs of extracting and sacking the 1,215 tons of ore from $22,283, the gross yield at $18 34 per ton, and a profit of $14,331 is shown.

We think the evidence would have justified the jury in finding that the plaintiff, as a practical miner of long experience in mining, whose business was that of mining, could, and would, probably, have extracted such quantities of ore from said ore bodies during his said term, if the defendant had not excluded him therefrom, and sold the same at such market price then existing as would have yielded him a net profit even greater than the sum allowed him for damages. The only value a mine has to a lessee thereof is the profits arising from his working the same, and, when he is wrongfully excluded and prevented from such working, his loss consists in the loss of profits that he would have made but for such exclusion.

"The adjudged cases very clearly show that in actions to recover for damages resulting from a tort a more liberal rule in favor of the plaintiff prevails than in actions to recover for a loss sustained from a breach of contract. Yet in the latter class of cases the overwhelming weight of authority supports the doctrine that profits, when not entirely speculative, may be taken into account (112 Ind. 555, *supra*); and it is only required that they be ascertained with a reasonable degree of certainty (*Chapman* v. *Kirby*, 49 Ill. 211).

"It is not to be forgotten that the law does not require absolute certainty in any case.  *  *  *  In a civil case all that is deemed requisite is a fair and reasonable degree of probability. Lord Mansfield says 'that the only degree of certainty attainable in judicial proceedings is a probable one,' and this is the doctrine of logic as well as of law writers. It is, indeed, impossible to secure any higher degree of certainty in human affairs, although there may be degrees of probability. All that can be required in any case or upon any subject is that the evidence shall tend, with a fair degree of probability, to establish a basis for a relevant inference." (*City of Terre Haute* v. *Hudnut*, 112 Ind. 557.)

"A tenant in common, when ousted by his cotenant, may recover damages resulting from the ouster, as well as when

ousted by an entire stranger to the land." (*Carpentier* v. *Mitchell*, 29 Cal. 330, and cases cited.)

The order appealed from is affirmed.

MASSEY, J.:   I concur.

BELKNAP, J., dissenting:

The written instrument which is the basis of this action is as follows:

"Know all men by these presents, that Eugene Howell, of the county of White Pine, State of Nevada, the party of the first part, and Frank Paul, of the same county and state, the party of the second part, do covenant and agree, and by these presents do covenant and agree, that the said party of the first part hereby leases unto the said party of the second part a one-third interest in and to that certain mine known as and called the 'Homestake Mine,' situated in Swansea cañon, near Shermantown, White Pine mining district, White Pine county, State of Nevada. This lease to take effect and go into force from this day, and to continue for a period of one year up to and including June 13, 1897. The provisions of this lease to be as follows: The party of the second part hereby agrees to work the said mine in a workmanlike manner, and leave the mine in as good a condition as it is at this time. The said party of the second part agrees to pay over to the said party of the first part, or to the sheriff of White Pine county, or to C. A. Mathewson, of Hamilton, White Pine county, Nevada, as shall be directed by the said party of the first part, royalty from all ores and ores taken out, extracted, and shipped from the said Homestake mine by the said party of the second part or by any one during the continuance of this lease, as follows:

"The party of the second part agrees to pay one dollar ($1) per ton net money for all ores shipped and worked from said mine which is at the rate of three dollars ($3) per ton for all ores taken out and shipped under this lease. This royalty to be net over everything, and no expenses of any nature to be deducted from same. Said royalty to be paid upon the first day of every month to the party or parties as hereinbefore named, together with duplicate statements of

ores worked by smelters. The said party of the first part empowers the party of the second part to ship all ores that may be out on the dumps and extracted from said Homestake mine at this time, the ores representing the one-third interest as named in this lease, paying the royalty therefor as herein named. All ores to be marked in the name of the Homestake mine. The party of the second part agrees to post a notice upon said mine at once that said mine and interest will not be responsible for any debts, obligations, expenses, wages, or dues of any nature or character whatsoever during the term of this lease, to read as follows: 'Know all men by these presents, that a one-third interest in the Homestake mine has been leased unto Frank Paul, and said mine will not be responsible or said Eugene Howell will not be responsible or holden, or said mine holden, for any debts, obligations, wages of men, expense of mining supplies, or any dues of any nature or character whatsoever during the term of this lease. In witness whereof we have this 13th day of June, 1896, set our hands and seals at Carson City, Nevada. Eugene Howell. [Seal.] Frank Paul. [Seal.]' We unite in the above lease, and agree upon and accept its terms and conditions upon the understanding that the royalty or rental mentioned therein shall be paid to C. A. Mathewson, to be by him held in trust and on special deposit, to be paid over when it. is determined to whom the same belongs. Irene M. Robinson. [Seal.] Robt. M. Clarke. [Seal.]"

The parties have called it a lease, but the name they have attached to it can make no difference as to its legal effect.

Bainbridge, in his work on the Law of Mines and Minerals (page 236), says: "There is a great distinction between a lease of mines and a license to work mines. The former is a distinct conveyance of an actual interest or estate in lands, while the latter is only a mere incorporeal right to be exercised in the lands of others. It is a profit *a prendre,* and may be held apart from the possession of land. * * * In order to ascertain whether an instrument must be construed as a lease or a license, it is only necessary to determine whether the grantee has acquired by it any estate in the land, in respect of which he might bring an action of eject-

ment. If the land is still to be considered in the possession of the grantor, the instrument will only amount to a license, and, though the grantee of the license will certainly be entitled to search and dig for mines according to the terms of his grant, and appropriate the produce to his own use, on payment of the stipulated rent or proportion, yet he will acquire no property in the minerals till they are severed from the land, and have thus become liable to be recovered in an action of trover."

Another distinction is that a lease is a contract for exclusive possession, whereas a license merely gives the licensee the right to use the premises for a specified purpose, the possession remaining in the licensor.

"The authorities are agreed that a license to dig and take ore is never exclusive of the licensor, unless expressed in such words as to show that that was the intention of the parties. Where the license simply gives the licensee the right to dig and take ore, the licensor may take ore from the same mine at the same time, and also grant permission to others to exercise the same right." (*Silsby* v. *Trotter*, 29 N. J. Eq. 233; *Malcomson* v. *Wappoo Mills* (C. C.), 85 Fed. 907.)

It will be noticed that under the provisions of the instrument above set forth respondent acquired no estate in the mine, and that his possession was not exclusive. I conclude, therefore, that the instrument is a license, and that plaintiff acquired no interest thereby except as to ore extracted by him. As to ore not extracted, there was no change of ownership.

For these reasons I dissent from the judgment.

UPON PETITION FOR REHEARING.

By the Court, BONNIFIELD, C. J.:

The defendant petitions for a rehearing, and suggests that the court overlooked certain points involved in the appeal. We considered all such points, but thought that it was not worth while to notice them in the written opinion. If we understand the petitioner's contention, it is, substantially, that the court below struck out all testimony of ore mined prior and subsequent to plaintiff's lease; that then nothing was left in the case on which the jury could base a verdict

for the plaintiff, and therefore the court below erred in deny-
ing defendant's motion for a nonsuit.  In our opinion, the
record does not show that all such testimony was stricken
out, but that it shows to the contrary.  Besides, in the
defendant's statement on motion for new trial he assigns as
error, to wit: "(14) The court erred in denying defendant's
motion to strike out all testimony of the witness Lanni con-
cerning ores mined on leases prior or subsequent to plaintiff's
lease."

We were of opinion, and still entertain it, that, if all the
testimony of ore mined prior and subsequent to the term of
plaintiff's lease had been stricken out, the court would not
have been justified in granting a non-suit.  For the undis-
puted testimony is that, in the month of April of the plain-
tiff's term under his lease, the defendant extracted about one
hundred tons from one body of ore and about eighty tons of
ore from another body in said mine; that at that time the
market price of lead was $3 30, and it appears from the evi-
dence that when lead was at that price said mine could be
worked at great profit.  And it is alleged in the complaint
that during the year between June 13, 1896, and June 13,
1897, being the term of plaintiff's lease, that the "defendant
extracted from said mining claim, and sold, gold, silver, lead
ore, of the value of $10,000."  The allegation that "defend-
ant extracted from said mining claim gold, silver, lead ore,
of the value of $10,000," between said dates, is not denied
by the answer; and, when the motion for non-suit was made
and denied, the fact alleged as aforesaid stood admitted, and
still stands so.

*Second Ground for Rehearing:*  The petitioner says:  "The
point made by the appellant in his opening brief, at page 18,
and which seems to have been overlooked, is that there is ,a
material and recognized distinction between profits to an
*established* business and a prospective one, and that actual
loss by interruption of an *established* business may be recov-
ered, while prospective loss for a business *to be* entered into
is denied."  The petitioner cites authorities and argues in
support of the above contention through several pages of
typewriting.  We are of opinion that the business of mining
on the Homestake mine was pretty well established, and that

the evidence shows that the profits thereof prior, during, and subsequent to plaintiff's lease were very great.

The uncontradicted evidence is that the defendant mined 7,000 tons of ore prior to plaintiff's lease; that the mine was profitably worked by lessees in 1893, 1894, and up to August, 1895; that, during the year next after plaintiff's lease expired, there were extracted by defendant's lessees 1,215 tons from the ore body, which the plaintiff proposed and intended to work, and which was of great net value. And it is shown by the pleadings that the defendant mined ore of the value of $10,000 during the plaintiff's said term. Oscar J. Smith testified: "This is the most desirable smelting ore in the world. High percentage of lead, and no undesirable ingredients." We think that the contention of the petitioner that mining on said mining claim was not an established business, and the conclusions he draws therefrom, are without merit.

*Third Ground:* Petitioner says the appellant did except to the oral charge of the court, for the reason that it did not correctly state the law applicable to the case; and he submits " that, as far as the oral charge of the court is concerned, the rule of *McGurn* v. *McInnis* ought not to be applied, and the objection heretofore presented to that charge should be considered." The oral charge contained several propositions, and it was excepted to as a whole or in gross. We think the rule is well established that in such case, if any portion excepted to is sound, the exception cannot be sustained. (*Morrill* v. *Palmer*, 33 L. R. A. 411, and cases cited.) " Exceptions should be specific, and should be directed, not to the charge as a whole, but to the portion or portions thereof which are considered objectionable. It is only where the charge is erroneous in its whole scope and meaning, or where the charge, in effect, asserts but a single proposition, that a general exception will be available." (8 Enc. Pl. & Prac. 257. See citations given of many cases in 25 state courts, and numerous cases in the federal courts.)

" If an exception is taken to an entire charge, containing several distinct and separate propositions, or in gross to a series of instructions, the exception will be unavailable if any one of the propositions in the charge or any of the instructions is correct." (8 Enc. Pl. & Prac. 259, and cases

cited from 27 states, and 20 cases from the United States courts.)

The charge in question contained these propositions, among others: "Coöwners of mining claims each have the right to work the mine. One is not liable for the expenses of the others' work. If either extracts valuable ore, he is liable to share the profits with the other. He is entitled to retain his costs and expenses out, but the profit after that must be divided with his coöwner in proportion to the interest of each."

We thought, and still think, the above propositions are correct. Counsel in their brief pointed out some other propositions embraced in said charge, and contended that they were erroneous. Whether they were erroneous or not, we did not consider material. If error was committed in giving them, the exception being taken to the whole charge, or in gross, it could not be sustained.

*Fourth Ground:* Petitioner says: "In our original brief we tried to make it clear to the court that Paul's so-called lease was void, because it would prejudice the rights of the cotenant, Cragnaz, to a partition; but a careful perusal of the majority opinion fails to show us wherein the court has taken notice of this view of the case, and hence we assume that it may have been overlooked. The court did consider Paul's rights to a partition, but does not seem to have looked at the possible rights that Cragnaz might have had." What we said about partition was in reply to the defendant's contention that Paul's only remedy was an action for partition, or for an accounting of rents and profits. We did not notice the contention, in our former opinion, that the plaintiff's lease was void because it would prejudice the rights of the cotenant, Cragnaz, to a partition, because his right in that respect was not involved in the case. The defendant did not seek a partition of the mine, and when he does so in a proper action, and his right thereto is properly brought before the court for adjudication, it will be time to pass upon that question. His "possible" right was not in issue.

In the case of *Boston Franklinite Co.* v. *Condit and Torrey,* 19 N. J. Eq. 394, on which petitioner seems to rely, we find

nothing to support said contention. In that case it was held that a tenant in common could not, as against his cotenant, convey his right to any specific portion of the common property, to the prejudice of his cotenant. The court said: "The reason is that it would prejudice the right of the cotenant to a partition. Each tenant in common of an undivided moiety has a right to partition by having one-half of the whole premises set off to him. He must not be compelled to partition one part with one cotenant, and another with another cotenant, as he would if such conveyance were good." That was a suit in equity for partition. The complainant claimed title to " one equal moiety or one-half part of the iron, zinc, and other ores in a tract of land in Sussex county." He claimed no title to any other part of said tract. His right to said ores was based on the following chain of title: E and F being the owners of said tract of land as tenants in common, F, by deed, conveyed to W and A, in terms, " all the iron, zinc, and other ores on or within any lands of F in the county of Sussex." This title of W and A by several mesne conveyances was vested in the complainant, and subsequently F conveyed to his son the undivided half of this tract, and the son conveyed this undivided half to E. The title of E in the tract was by several mesne conveyances vested in the defendants. The court held that the complainant was not entitled to partition as against the defendants, or to any relief as against them. And why? (1) Because the title to said tract having become vested in E, the other cotenant, in severalty, and through him in the defendants, there could be no partition. (2) Because the said conveyance of said ores by F was a conveyance of a specific part of said tract of land held by E and F in common, and was void as to E, and his grantees.

Under the act of congress of May 10, 1872, a lode-mining claim consists of a tract of land with defined surface boundaries, including all lodes, veins, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extending downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the verti-

cal side lines of such surface location. (Congressional Act; *Gleeson* v. *Martin White M. Co.*, 13 Nev. 442.)

" The location is of a piece of land, including the vein." (13 Nev. 442, *supra*.)

The lease in question was not a lease simply of the ores (a particular part of the common property), but a lease of an undivided one-third of. a tract of land (the Homestake mining claim), including an undivided one-third of the ores therein. We find nothing in the New Jersey case that in any degree supports petitioner's contention.

*Prospective Damages:* Petitioner cites several authorities to support his contention that the plaintiff could not recover damages sustained by loss of future prospective profits. The answer to this is that the plaintiff's action was not brought to recover damages for loss of profits which he might at some future time sustain by reason of being excluded from working said mine by defendant, but to recover damages for the loss of profits which he had sustained by being prevented from working said mine during the term of his lease, which was then past. That he could have made large profits by working said mine during said term we think was clearly shown by the evidence, as we pointed 'out in the former opinion.

The petition for rehearing is denied.

MASSEY, J.: I concur.