McCORNICK et al. v. UNITED STATES MINING CO.

UNITED STATES MINING CO. v. McCORNICK et al.

(Circuit Court of Appeals, Eighth Circuit. February 16, 1911.)

Nos. 3,291, 3,293.

1. DAMAGES (§ 40*)—LOST PROFITS—CERTAINTY.
   Lost profits are recoverable as damages only when they are ascertainable with certainty, and not when they are indefinite and remote.
   [Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 72–88; Dec. Dig. § 40.*]

2. INJUNCTION (§ 252*)—LIABILITY ON BOND—SPECULATIVE DAMAGES.
   A mining company, wrongfully enjoined from operating a mine, is not entitled to recover on the injunction bond profits lost, where it appears that, on account of other mines, operations were not suspended by the injunction, and that the particular mine would have been worked to an uncertain extent.
   [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 586–598; Dec. Dig. § 252.*]

In Error to the Circuit Court of the United States for the District of Utah.

Action by the United States Mining Company against W. S. McCornick and another. From the judgment, both parties bring error. Partly affirmed, and partly reversed and remanded.

Charles C. Dey (A. L. Hoppaugh, on the brief), for McCornick and others.

W. H. Dickson (A. C. Ellis, A. C. Ellis, Jr., Russell G. Schulder, and E. M. Allison, Jr., on the brief), for United States Mining Co.

Before SANBORN and ADAMS, Circuit Judges, and WM. H. MUNGER, District Judge.

WM. H. MUNGER, District Judge. In June, 1902, the United States Mining Company (a corporation) commenced an action in the United States Circuit Court for the District of Utah against Leonidas M. Lawson and others, to quiet its title to certain named mining claims in Salt Lake county, state of Utah, which mining claims were in the possession of said United States Mining Company. Such proceedings were had in said action that in March, 1903, a decree was made and entered by said court, dismissing the action at the cost of plain-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tiff. From that decree plaintiff duly prosecuted an appeal to this court, and in November, 1904, this court reversed said decree and remanded the cause to the Circuit Court, with directions to enter a decree for plaintiff as in its bill prayed for. In October following the Supreme Court of the United States issued a writ of certiorari in said suit to review the decree of this court. Thereafter, on application of defendant, the Circuit Court granted an injunction restraining plaintiff from mining or removing any of the ore from the mines in controversy in said suit until the further order of the court, upon the giving of a bond, to be approved by the court, conditioned to pay plaintiff any damages it should sustain, if it should finally be decided that said injunction should not have been granted, or in case the decree of this court should be affirmed by the Supreme Court. Such a bond was executed by W. S. McCornick and M. H. Walker, approved by the court, and filed in the clerk's office, December 8, 1905. In February, 1908, the Supreme Court affirmed the judgment of this court, and the mandate of the Supreme Court was received and filed in said Circuit Court March 2, 1908, and on the same day the injunction was dissolved. Thereafter the United States Mining Company commenced in said Circuit Court an action against McCornick and Walker on said bond to recover damages which it claimed it had sustained by reason of the said injunction. In the petition its claim of damages consists of two elements, which are therein stated, in substance, as follows:

First. That beneath the surface of said mines there are large bodies of ore of great value, containing lead, silver, copper, and other valuable metals; that during the period while said injunction was in force plaintiff could have, and but for said injunction would have, from beneath the surface of said mines, extracted and disposed of not less than 100 tons of ore daily for each and every day of said period, from which it would have made and received a large net profit each and every month during the whole of said period; that the interest on said net profits, computed at the rate of 8 per cent. per annum from the time such monthly profits would have been received to the date when said injunction was dissolved, would have amounted to not less than the sum of $72,500, which amount has been lost to plaintiff by reason of the said injunction.

Second. That during the whole of the period that the injunction was in force the market price of each of said metals of lead, copper, and silver was uniformly higher than at any time since the dissolution of the injunction; that but for said injunction plaintiff would have realized and received for the lead, copper, and silver contained in said mines, which it could and would have extracted, $260,708 more than it could have received at any time since the injunction was dissolved.

Issues were joined, and upon the trial plaintiff recovered a judgment against defendants upon the first of said claims. The court dismissed the action as to the second claim, stating:

"Concerning the question of loss of profits, by reason of depreciation, that is too remote, because the ore has not yet been taken out. The market price

is variable, and it is pure speculation as to whether eventually there will be loss or profit."

From the judgment of the court, dismissing its second claim, plaintiff alleges error, and from the judgment of the court in favor of plaintiff, and against defendants, upon the first claim, defendants allege error.

[2] Upon the trial of the cause it was shown by the evidence that a considerable amount of ore development had been made in the mines in question, from which several mining engineers made a reasonably accurate estimate that the mines contained approximately 230,000 tons of ore. Some 80 or 90 samples of the ore were taken from various different locations, and assays made showing the quantities of the several metals therein. Evidence was given of the estimated cost of mining the ore and extracting the valuable metal therefrom. The evidence also shows that the market price of such metals varied at different times while the injunction was in force; also that plaintiff, to have realized from the ore the profits claimed, would have had to enter into a contract with the smelter to deliver at least 100 tons per day; that a lesser quantity would not have realized to it the same relative amount of profit. Whether such a contract could have been made is only shown by the opinion of the witness. At the time the injunction was issued, and all the time during its continuation, plaintiff was the owner of and working other neighboring mines, containing large ore bodies, which it would take, according to the estimates of its own witnesses, some eight years to mine. While the injunction was in force, plaintiff prosecuted its mining operations as before, and to have taken out 100 tons per day additional the manager of the plaintiff testified they would have had to employ from 40 to 50 more men. Whether this additional force could have been obtained the evidence does not disclose. Notwithstanding plaintiff had been in undisturbed possession of the mines in question for a number of years, it had only taken out, prior to the granting of the injunction, some 500 to 1,000 tons in all, and from the time of the dissolution of the injunction to the time of the trial (some 16 months), they took out but 7,500 tons. The manager of plaintiff, on being asked while on the witness stand why more ore was not taken out of the mines in question, answered:

"I don't know that I could give any definite reason. There were other ores just as convenient as those, and we have taken our time to get the others—simply haven't got to it. It was ours, and we could take it out at any time."

This answer of the witness, we think, reflects the true situation. Considering that plaintiff had other large ore bodies just as convenient, that its mining operations were conducted during the time the injunction was in force the same as before and afterwards, and that, to have mined 100 tons per day from the mines in dispute, its facilities would have had to be considerably increased, we are constrained to believe that, had no injunction been granted, the mines would have been operated just as before and since, ore would have been taken therefrom from time to time just as it happened to be most convenient so to do, and the testimony of the witness that, but for the injunction, plaintiff

could and would have taken out 100 tons per day, was but the expression of an opinion or conjecture, so far as it relates to the expression "would have."

The damages sought to be recovered are based on an alleged loss of profits. [1] The law with respect to loss of profits being the basis of a recovery in an action for damages is that profits which would have been realized, but for the act of defendant, and which are not open to the objection of uncertainty or remoteness, may be recovered, but profits depending upon numerous uncertain and changing contingencies are too indefinite and untrustworthy to constitute a just measure of actual damages. Howard v. Stillwell & Pierce Mfg. Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147; Coosaw Min. Co. v. Carolina Min. Co. et al. (C. C.) 75 Fed. 860; Central Coal & Coke Co. v. Hartman, 49 C. C. A. 244, 111 Fed. 96; Cincinnati Gas Co. v. Western Siemens Co., 152 U. S. 200, 14 Sup. Ct. 523, 38 L. Ed. 411; Callaway Min. & Mfg. Co. v. Clark, 32 Mo. 305.

The case of Coosaw Min. Co. v. Carolina Min. Co. et al., supra, is an interesting case directly applicable to this. In that case the General Assembly of South Carolina had granted to the Coosaw Mining Company the exclusive right of digging, mining, and removing phosphate rock from the bed of the Coosaw river. Soon thereafter the question was agitated as to whether that privilege or right was limited in duration. In 1890 the General Assembly resolved the question for itself by passing an act declaring that whatever rights the Coosaw Mining Company had in that river were ended, putting the phosphate deposits therein under the charge of a board of commissioners, who were authorized to issue licenses to such persons as they should approve to dig, mine, and remove phosphate deposits in the navigable streams of the state, including the bed of the Coosaw river. The Carolina Mining Company obtained from the commission a license to remove phosphate deposits from the Coosaw river. In March, 1891, the Coosaw Mining Company commenced an action against the Carolina Mining Co. et al., the object and purpose being to test the constitutionality of the act of the assembly above referred to, and to ascertain and define the rights of the Coosaw Mining Company, and prayed for and obtained an injunction against the Carolina Mining Company, restraining it from mining and removing any of the phosphate deposits in the Coosaw river, pending the hearing. The injunctions were subsequently dissolved, and it was held, in a proceeding to recover damages upon the bonds, that the plaintiffs could not recover as damages the profits which they might possibly have made, had they been allowed to work the Coosaw river in addition to the other navigable rivers in the state which they were licensed to work, since the conditions of successful working varied from day to day, and it appeared that the price of such phosphate constantly fluctuated, etc.

Callaway Min. & Mfg. Co. v. Clark, supra, was an action for damages for the seizure and detention of a steamboat by an attachment which was discharged. It was held that the measure of damages was the actual damage only sustained by the seizure, and that the

jury could not be permitted to speculate as to what might or might **not** have been the earnings of the boat during the period of seizure.

From a consideration of the whole evidence, it is apparent that plaintiff's claim for damages in this case is of such a speculative, uncertain, and conjectural nature that it cannot be made the basis of a recovery. For these reasons, the ruling of the court that the plaintiff was not entitled to recover any sum whatever on account of the loss which it had sustained by reason of the depreciation in value of the metals of lead and silver remaining in the ground is approved and confirmed.

The judgment of July 1, 1909, from which the writs of error in these causes are prosecuted, is reversed, with an allowance of cost to plaintiffs in error in No. 3,291, and the causes are remanded, with directions to grant a new trial.