# RALSTON et ux. v. UNITED VERDE COPPER CO.

District Court, D. Arizona. November 18, 1929.

No. 266.

O'Sullivan & Morgan, Joseph H. Morgan, and Louis H. Bunte, all of Prescott, Ariz., for plaintiffs.

Anderson, Gale & Stack, of Prescott, Ariz., for defendant.

NETERER, District Judge. ▮ Did the defendant create a prescriptive right? George v. Gist (Ariz.) 263 P. 10; Atchison, T. & S. F. Ry. v. Edwards (C. C. A.) 15 F. (2d) 37. The defendant's challenge must derogate some right of plaintiff, and, until injury, no actionable right is contravened. There was no injury or damage disclosed by the evidence until 1919, and, until a right was derogated, the plaintiff could not have invoked the process of the courts. U. S. v. Luce (C. C.) 141 F. 385-421. No cause was present. Stamm v. City of Albuquerque, 10 N. M. 491, 62 P. 973. The gravamen of an action is injury. Trinity Portland Cement Co. v. Horton (Tex. Civ. App.) 214 S. W. 510. Nor can the prescriptive right be broader than the asserted right covering the full period. The ore treated for the years 1926 and 1927 was in excess of 1,304,000 tons each year, of which 326,000 tons was sulphur. For the year 1919, 441,957 tons were treated, of which 110,000 tons was sulphur. Three times as much sulphur fumes were carried upon and over the lands of the plaintiff during 1926 and 1927 as in 1919. A's prescriptive right to flood B's land with 12 inches of water would not permit A to flood B's land with 36 inches of water, and, by the same token, the right to carry gaseous fumes from 110,000 tons of sulphur would not grant the right to carry fumes from 326,000 tons of sulphur. Nor was the use continuous, the smelter being shut down in 1919. The prescriptive right cannot obtain.

▮ The abandonment of the farms from 1920, the time of the destruction of the ditch, until it was repaired in 1925, did not bar the plaintiffs from repairing the ditch and creating value for the destruction or impairment of which the defendant would be answerable. The statute does not bar a right asserted within two years from the accrual of the action. This action was begun December 22, 1927. The injuries asserted are for 1926 and 1927. The action is not barred.

There are three elements of damage: (1) To growing crops; (2) forage for cattle on lands described and on public range; (3) rental value.

▮ For destruction of the growing crops, the measure of damages is the condition of the crop at the time of injury. Lommeland v. St. Paul, M. & M. Ry. Co., 35 Minn. 412, 29 N. W. 119. To establish value at the time of destruction, any or all methods of computation which may afford a fair basis may be considered, and, while neither may afford positive proof, all may afford data as a basis for conclusion. Colorado Con. Land & Water Co. v. Hartman, 5 Colo. App. 150, 38 P. 62. Damages for the growing crops described in counts 1, 2, and 7 have been fairly established to the amount above indicated.

▮ Do the proofs before the court furnish a basis for a fair and reasonable rental value? Farmers, in negligence cases, are required to exercise ordinary care and moderate expense. 13 Cyc. 75. This is not the rule in nuisance cases. It was the duty of the defendant to abstain from injury, and the farmers are not bound to expend time and money to secure enjoyment of their legal right, which was taken from them by the wrongful act of the defendant, and, if by reason of poverty they are unable to do so, leave their farms. The exercise of due diligence with the means at hand is the most that could be required. The rule of good faith and fair dealing obtains. See Gilbert v. Kennedy, 22 Mich. 117; American Smelting Co. v. Riverside Dairy & S. Farm (C. C. A.) 236 F. 510, 514.

What would an ordinarily prudent person, under like circumstances, be expected to do? The defendant company has many millions of dollars invested. Davis paid for his land $13,600; for reconstructing the ditch in 1916, in excess of $14 per acre was required. The fumes in 1919 injured the crop. The ditch, by excess water, was destroyed in 1920. Davis left his land for the time and secured employment as a mail carrier. Some of the others farmed in a limited way, but, except in 1921, when the smelter was shut down, were damaged by $SO_2$ from the smelter. In 1925 the ditch was repaired at a cost in excess of $14 per acre to the parties who entered into the endeavor. Water was avail-

able from the ditch for irrigation. Davis, having no farming implements, had leased his land, but, because of the fumes, the parties would not continue. Others were deterred from taking leases. See, also, Joerger v. Pac. Gas & Elec. Co. (Cal. Sup.) 276 P. 1017.

The defendant contends that eviction is necessary before the reasonable rental may be recovered for the time the owner is *wrongfully kept out of possession*. This rule in a continuing nuisance does not apply. While the owner was in physical possession, he was deprived of the beneficial use of the land by the continuous contact with the destructive fumes with the growing crops. Planting was a useless effort, so established by prior experience. The court knows that planting and seeding entail expense; that during this period the farmer and his family must live. The evidence shows that the deadly effect of poisonous gases is as certain as the wind from the smelter to the land, which is shown to be about one-third of the time. The owners were dispossessed of the beneficial use of the land. The defendant's assertion that there is no economic loss would require annual planting, foredoomed to damage, and annual litigation, which the farmers could not afford, and would result in a denial of justice.

When the parties placed water available, they were not required to go to the expense of planting a crop, which, in previous years, had shown them was doomed to injury and loss, and then litigate the defendant on liability therefor. It is evident, from the appearance of some of the assignors in this case, that they could not financially bear such burden.

In McCornick v. United States Mining Co. (C. C. A.) 185 F. 748, the claim was entirely speculative, and rested on many contingencies, and there was no evidence that the contingencies could have been met; nor is Western Tel. Co. v. Totten (C. C. A.) 141 F. 533, elucidating. That was an action for damages for alleged false statements in telegrams, and the damages recovered were only the natural, probable, effect of the deceit produced. Swain v. Tenn. Copper Co., 111 Tenn. 430, 78 S. W. 93, 94, rather is in support of the plaintiffs, that this is an action against the defendant to recover for the damages caused by *the defendant*. "This is the only reasonable and just rule that can be applied," says Judge Shields for the court.

The evidence of the defendant that there is no economic loss is not persuasive. The gases issuing from one of the stacks of the defendant's smelter contain approximately

10,000 parts per million, and 18,000 parts per million from the other stack. In the absence of air currents, after shooting several hundred feet into the air, to a point where the temperature of the gases is probably that of the atmosphere, the gases plume out and "form a great big plume," and gradually drop to the ground, where the concentration is approximately 5 or 6 parts per million; and when the gases are carried by the wind and diffused at a greater distance, the concentration is less per million. The evidence shows that upon these lands the concentration is 1 part per million or more. $SO_2$, as low as 1 part per million, under some conditions, will injure vegetation. Plants vary in their susceptibility to $SO_2$, and likewise in their recuperative power; spinach, lettuce, and vegetables have no recuperative power. In the formative state, pistils, stamens, silks and tassels of corn, grains in process of heading, are susceptible to $SO_2$ injury, but are more resistant than the foliage of the plants. When $SO_2$, present in the atmosphere, passes into the leaves through the stomata, if injury results, the cells within the leaf are broken, cell life destroyed, and the leaf within the area of injury becomes marked, bleached, and desiccated, plainly observable. The sensitiveness of the plant, the concentration of the atmosphere, length of time during which the plant is subjected to $SO_2$, and humidity are essential conditions. Light, darkness, heat, or cold affect or control the opening or closing of the stomata.

The scientific mind may conceive how $SO_2$ may destroy upon the alfalfa stem from 35 to 60 per cent. of the leaves, and the alfalfa grow new leaves and produce as large a crop within the same time as though the leaves had not been burned. To the lay mind it appears that the strength and time required to produce the new leaves would have produced additional growth and weight, and the loss to the field of alfalfa is very great, and greatly reduces, if not destroys, the profit, and, in effect, destroys rental value. To pick from the lettuce the outside burned leaves, and no economic loss follow, is refuted by the statement. The fact that heavy fertilization will speed growth of alfalfa and lessen time to mature does not show there is no economic loss. While the defendant has experimented with farms near its smelter and within the gaseous zone, it has by heavy fertilization demonstrated that alfalfa is grown for hay and pasturage and dairy use (it is said that the alfalfa stem, without leaves, has food value), but the evidence does show that there is a marked effect upon the alfalfa from $SO_2$.

And there is no credible evidence that the value of the crop production, by the same fertilization and use, would not be greatly enhanced without the SO₂ effect.

The defendant is liable for the reasonable value of the crops destroyed and for the reasonable rental value of the lands so destroyed by gaseous fumes, smoke, etc., but only for that portion of the damage resulting from the fumes from its smelter commingled with the fumes of the United Verde Extension Smelter.

The total damage is $5,750. During 1926 and 1927 the defendant smelter treated 2,608,572 tons of ore, and the United Verde Extension smelter treated 787,803 tons of ore, or approximately 22½ per cent. of the total amount of ore treated by the two companies was treated by the United Verde Extension smelter, and the plaintiff should recover from the defendant 77½ per cent. of the damage done—$4,456.25. See Miller v. Highland Ditch Co., 87 Cal. 430, 25 P. 550, 22 Am. St. Rep. 254; Swain v. Tenn. Copper Co., supra. The court must estimate as best it can from the evidence the total damage (see Jenkins v. Penn R. Co., 67 N. J. Law, 331, 51 A. 704, 57 L. R. A. 309; City of Mansfield v. Bristor, 76 Ohio St. 270, 81 N. E. 631, 10 L. R. A. (N. S.) 806, 118 Am. St. Rep. 852, 10 Ann. Cas. 767; Ogden v. Lucas, 48 Ill. 492; Jordan v. United Verde Copper Co. (Jordan v. United Verde Extension Mining Co.) (D. C.) 9 F.(2d) 144, affirmed (C. C. A.) 14 F. (2d) 299, and cases supra), and assess against the defendant the damage done by it as nearly as may be. Accuracy in such cases is impossible, but the amount of SO₂ from each smelter may be some guide.

The motions of defendant for judgment are denied, and judgment, accordingly, directed for plaintiff.