**UNITED ELECTRIC COAL COMPANIES**
**v. RICE et al.**
No. 4655.

District Court, E. D. Illinois.

Jan. 13, 1938.

On Rehearing Feb. 18, 1938.

William M. Acton, of Danville, Ill., and Ralph F. Lesemann, of East St. Louis, Ill., for plaintiff.

George W. Dowell, of DuQuoin, Ill., Nobel Y. Dowell, of East Peoria, Ill., and C. C. Dreman, of Belleville, Ill., for defendants.

Haight, Goldstein & Hobbs (by George I. Haight), of Chicago, Ill., also for defendants on motion for rehearing.

WHAM, District Judge.

This case is now before the court on plaintiff's motion for damages. A review of its history discloses that the case was begun on November 15, 1934, as a suit to restrain defendants from interfering with and preventing by force, violence, threats, and intimidation the operation of plaintiff's mine known as the Red Ray, or Freeburg, mine and for other relief. The bill of complaint set forth in great detail the alleged facts relied upon by plaintiff concerning the happenings at the mine from the beginning of the strike at said mine on April 1, 1933, the efforts made by plaintiff to reopen and operate the mine, the wrongful conspiracy and conduct thereunder of defendants preventing and continuing to prevent such reopening, the injury and damage caused plaintiff prior to date of suit by defendants' wrongful conduct, and the injury and damage that would be caused in the future if defendants were not restrained. The prayer for relief was specifically for injunctive relief, and for general relief as follows: "That the plaintiff be granted such other and further relief in the premises as equity may require and to the Court may seem meet." The answer of the defendants having been filed, the cause was heard before the court upon the issues of plaintiff's right to injunctive relief and, if such right was established, the jurisdiction of this court to grant such relief in view of existing federal legislation. The question of recoverable damages and plaintiff's right to recover damages in the suit was not mentioned or considered during the trial or in arguments or briefs of counsel or in the findings and conclusions of the court or in the decree. For reasons appearing in said findings and conclusions and in the court's opinion (D.C., 9 F.Supp. 635), it was held in substance that while the plaintiff, under the evidence, had suffered and would suffer irreparable damage if defendants were not restrained and, under the evidence, was entitled to injunctive relief, this court was without jurisdiction to grant such relief in view of the provisions of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115, and the bill was dismissed for want of jurisdiction.

On appeal the case was reversed by the Circuit Court of Appeals for reasons set forth in the opinion of that court. 7 Cir., 80 F.2d 1. This court was held to have jurisdiction to grant injunctive relief. Defendants' petition for a writ of certiorari was denied by the United States Supreme Court (297 U.S. 714, 56 S.Ct. 590, 80 L.Ed. 1000) and on the filing of the mandate of the Circuit Court of Appeals in this court a decree was entered pursuant thereto on January 20, 1936, enjoining the defendants from interfering with the operation of plaintiff's mine and further providing as follows: "It is further ordered, adjudged and decreed that this court retain jurisdiction of this cause to the end of entertaining and hearing any application for any modification or extension of the above and foregoing provisions of this decree or for any other relief to which the plaintiff may be entitled under the allegations and prayer of the bill of complaint herein, the findings of this Court, and said decree and opinion of said United States Circuit Court of Appeals; provided * * *."

On March 30 following, plaintiff filed its original motion herein for an assessment and allowance of damages based on the record. Defendants filed their motion in opposition thereto, and after a number of motions, countermotions, rulings by the court, and two appeals by the defendants, the cause came to an issue on plaintiff's amended motion for damages and for judgment and defendants' motion in opposition. This court, in its various rulings in disposing of the motions aforesaid, has held in substance that it has power and jurisdiction in equity to render a decree for damages in a suit brought for injunctive and other relief even though a decree for damages is not specially prayed for, if the allegations of fact in the bill are sufficient to sustain such decree and such allegations are sustained by the proof; that the allegations of the bill in this suit are sufficiently broad to sustain a decree for damages; that plaintiff's motion therefor was filed in apt time; that the findings and conclusions of the court filed at the conclusion of the original trial during which the sole issue being considered by the court was the right of the plaintiff for injunctive relief are not conclusive upon the court on the issue of recoverable damages and the liability of defendants and each of them to the plaintiff for such damages; also, that plaintiff and the defendants had the right to introduce further evidence on the issues of the amount of damages suffered by plaintiff and the liability of defendants, upon which additional evidence, if any, with the evidence heard at the original trial the court would base its findings of fact and conclusions of law on the issue of damages.

The case came on for further hearing on the issue of damages, and additional evidence offered by plaintiff and defendants was received and the entire record is now before the court on arguments and briefs of counsel.

It may be well to advert briefly to certain principles of law, equity and procedure which have been presented for determination by the preliminary motions above mentioned, as well as to certain other principles of importance in making proper disposition of plaintiff's motion for damages.

■ A court of equity having properly obtained jurisdiction over a cause and the parties thereto, and this applies to a suit for injunctive relief, will retain jurisdiction for all purposes in order to do complete justice between the parties even though in so doing it becomes necessary to litigate incidental issues legal in character which, standing alone, would be determinable only in a suit at law. Equity Rule 23 of the United States Supreme Court, 28 U.S.C.A. following section 723; Pomeroy's Equity Jurisprudence, 4th Ed., vol. 1, §§ 181, 236, 237, and 242; 21 C.J. 138; 10 R.C.L., title Equity, § 120; 4 Cyc.Fed.Proc. § 1,057; Hughes Fed.Prac. § 1002; Camp v. Boyd, 229 U.S. 530, 551, 552, 33 S.Ct. 785, 57 L.Ed. 1317; McGowan v. Parish, 237 U.S. 285, 296, 35 S.Ct. 543, 59 L.Ed. 955; Zenith Carburetor Co. v. Stromberg Motor Devices Co., 7 Cir., 270 F. 421, 424; Kinney-Coastal Oil Co. v. Kieffer, 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961; Maytag Co. v. Meadows Mfg. Co., 7 Cir., 45 F.2d 299, 301, certiorari denied, 283 U.S. 843, 51 S. Ct. 489, 75 L.Ed. 1452; Harr v. Pioneer Mechanical Corporation, 2 Cir., 65 F.2d 332, 335; Peale v. Marion Coal Co., C.C., 172 F. 639; Chicago, M. & St. P. Ry. Co. of Idaho v. United States, 9 Cir., 218 F. 288, affirmed by Supreme Court 244 U.S. 351, 37 S.Ct. 625, 61 L.Ed. 1184.

■ The propriety of applying the principle stated in the preceding paragraph in a suit in equity for injunctive relief where plaintiff has no adequate remedy at law and in which, to administer complete relief, it becomes necessary to assess damages and render a money judgment therefor, is generally recognized and is now the established rule. Pomeroy's Equity Jurisprudence, 4th Ed. vol. 1, §§ 236, 237; 21 C.J. 141, 142; 32 C.J. 382; 10 R.C.L. p. 370, 371; Cyc.Fed.Proc. § 3291; Omaha Horse Railway Co. v. Cable Tramway Co., C.C., 32 F. 727; United States v. Guglard, C.C., 79 F. 21; The Salton Sea Cases, 9 Cir., 172 F. 792, certiorari denied California Development Co. v. New Liverpool Salt Co., 215 U.S. 603, 30 S.Ct. 405, 54 L.Ed. 345; United States v. Denver & R. G. R. Co., C.C., 190 F. 825; Kinney-Coastal Oil Co. v. Kieffer, 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961; Maytag Co. v. Meadows Mfg. Co., 7 Cir., 45 F.2d 299, certiorari denied 283 U.S. 843, 51 S.Ct. 489, 75 L.Ed. 1452; Winola Lake & Land Co. v. Gorham, D.C., 13 F.Supp. 721; American Hide & Leather Co. v. Andersen, 153 Ill.App. 79; McGuire v. Boyd Coal & Coke Co., 236 Ill. 69, 86 N.E. 174; Fox et al. v. Lete et al., 278 Ill.App. 636, mem.

■ In such case the question of damages being incidental to the principal issue which brings the suit into equity, and inseparably bound up therewith, it is neither practicable

nor is it required by the constitutional provision for jury trials in law cases that the question of damages be submitted to a jury. The Salton Sea Cases, 9 Cir., 172 F. 792, 799–803. To submit the question of recoverable damages to a jury in the case before the court would practically require a complete retrial of the case to determine an incidental issue. It is to avoid such multiplicity of trials that "a court of equity, if obliged to take cognizance of a cause for any purpose, will ordinarily retain it for all purposes, even though this requires it to determine purely legal rights that otherwise would not be within the range of its authority." Camp v. Boyd, 229 U.S. 530, at page 552, 33 S.Ct. 785, 793, 57 L.Ed. 1317. See, also, Greene v. Louisville Ry. Co., 244 U.S. 499, 520, 37 S.Ct. 673, 61 L.Ed. 1280, Ann.Cas.1917E, 88; McGowan v. Parish, 237 U.S. 285, 296, 35 S.Ct. 543, 59 L.Ed. 955; American Hide & Leather Co. v. Andersen, 153 Ill.App. 79; McGuire v. Boyd Coal & Coke Co., 236 Ill. 69, 86 N.E. 174; Kieth v. Henkleman, 173 Ill. 137, 50 N.E. 692.

■ If the facts pleaded in the plaintiff's bill are sufficient to support such relief, damages may be allowed under the prayer for general relief though there be no special prayer for damages. Omaha Horse Ry. Co. v. Cable Tramway Co., C.C., 32 F. 727; Tyler v. Savage, 143 U.S. 79, 12 S. Ct. 340, 36 L.Ed. 82; The Salton Sea Cases, 9 Cir., 172 F. 792, certiorari denied California Development Co. v. New Liverpool Salt Co., 215 U.S. 603, 30 S.Ct. 405, 54 L. Ed. 345; Gabrielson v. Hogan, 8 Cir., 298 F. 722, 726; DeBlois v. Bowers, D.C., 44 F.2d 621. Such procedure is in accord with the universally recognized general principle that, as stated in Lockhart v. Leeds, 195 U.S. 427, 25 S.Ct. 76, 79, 49 L.Ed. 263, "there is nothing in the intricacy of equity pleading that prevents the plaintiff from obtaining the relief under the general prayer, to which he may be entitled upon the facts plainly stated in the bill." See, also, 21 C.J. 679–682; 4 Cyc.Fed.Pro. § 1048; Simpkin's Fed.Pro., 1934 Ed., § 535; Hughes Fed.Prac. § 4265; Turner v. Kirkwood, 10 Cir., 62 F.2d 256, 259, 260; Bemis Bros. Bag Co. v. United States, 289 U.S. 28, 53 S.Ct. 454, 77 L.Ed. 1011; Tayloe v. Merchants' Fire Ins. Co., 9 How. 390, 13 L.Ed. 187.

■ Seemingly, it is not questioned nor can there be reasonable doubt that the facts alleged in plaintiff's bill are sufficiently broad and specific to support a money judgment for damages, in addition to injunctive relief. If said allegations have been proved as laid, plaintiff is entitled to a judgment for damages under its prayer for general relief. (See authorities cited in preceding paragraph.) This is true, within the discretion of the court, even though the motion to assess damages was not filed or the right to recover damages urged, until after plaintiff's right to an injunction had been determined by trial, appeal, and final injunctional decree, where, by the terms of the decree, the court retained jurisdiction of the cause "for entertaining and hearing any application for * * * any other relief to which plaintiff may be entitled under the allegations and prayer of the bill. * * *"

Ordinarily, where it is the purpose of the plaintiff, in order to obtain complete relief, to seek damages in a suit for an injunction it is not good practice to permit that purpose to be concealed from court and opposite parties and their counsel during the trial of the main issue under the broad cloak of a prayer for general relief, without giving notice of such purpose. Such practice results, as in this case, in the conduct of the defense without the issue of recoverable damages in view, in unenlightened rulings by the court during the trial and in the formulation of findings and conclusions by the court without consideration of the rights of the parties under the evidence on the issue of recoverable damages. Perhaps the practice may not be open to just criticism in this case, for here, as shown by the record, the principal question at issue was not as to whether substantial injuries had been inflicted by defendants and would continue to be inflicted if not enjoined. That fact was not seriously in dispute and, though not admitted, was established by overwhelming evidence. The main issue was whether this court had jurisdiction to grant injunctive relief. Without such jurisdiction the court could grant no relief, equitable or legal. So it was that the presentation of the question of the amount of recoverable damages, which was wholly incidental to the main issue, was deferred by the plaintiff until after the jurisdiction of the court had been established and the injunction allowed. This procedure has made it necessary for the court to take further evidence, to modify some findings and conclusions heretofore made, and to make additional findings and conclusions in order properly to assess and

render a proper and just judgment for damages herein.

No one questions that employees have the right to strike or to quit work at any time and though the employer may have to quit business and may suffer heavy losses by reason of such strike, the striking employees are not liable for the damages so suffered as they have done only that which they have a lawful right to do. But that striking employees, labor unions, officers of labor unions, and other sympathizers, who, during the progress of a strike, in attempting to advance or achieve the purpose of the strike, enter into a conspiracy to inflict violent injury upon an employer or upon its property or business and in furtherance of the object of the conspiracy any or all of the coconspirators do by violence or other unlawful conduct inflict injury upon the property or business of such employer or by such unlawful means do obstruct its business or prevent it from conducting its business, are each liable to respond in damages for such loss or injury so inflicted by any of such conspirators appears from the following authorities: 5 R. C.L. § 43, p. 1093; 12 C.J. 610–612; Doremus v. Hennessy, 176 Ill. 608, 52 N.E. 924, 54 N.E. 524, 43 L.R.A. 797, 802, 68 Am.St. Rep. 203; Purington v. Hinchliff, 219 Ill. 159, 76 N.E. 47, 2 L.R.A.,N.S., 824, 109 Am.St.Rep. 322; United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; Coronado Coal Co. v. United Mine Workers of America, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; McCandless v. Furlaud, 296 U.S. 140, 165, 56· S.Ct. 41, 49, 80 L.Ed. 121; Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., C.C., 54 F. 730, 739, 19 L.R.A. 387; Calcutt v. Gerig, 6 Cir., 271 F. 220, 222, 223; Lewis v. Ingram, 10 Cir., 57 F.2d 463; Northern Kentucky Telephone Co. v. Southern Bell Telephone Co., 6 Cir., 73 F.2d 333, 97 A.L.R. 133.

Among the elements of damages that may be assessed, if sufficiently proven and traced to the wrongful conspiracy, in such case where the employer is wrongfully prevented from operating its plant, mine, or business are loss of profits, loss of business that cannot be regained, unavoidable depreciation of plant and property through disuse, cost of maintenance, and necessary overhead expenses during the shutdown. Chapman v. Kirby, 49 Ill. 211, 218; Keegan v. Harlan, 134 Ill.App. 363; Miller Agency v. Home Ins. Co., 276 Ill.App. 418; American Can Co. v. Ladoga Canning Co., 7 Cir., 44 F.2d 763; Weinman v. DePalma, 232 U.S. 571, 34 S.Ct. 370, 58 L.Ed. 733; United Mine Workers of America v. Coronado Coal Co., 8 Cir., 258 F. 829, reversed by Supreme Court on another point, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; Pennsylvania Steel Co. v. New York City R. R. Co., 2 Cir., 198 F. 721. Care should be exercised in such case not to assess against such wrongful conspirators items of damage that grow out of the strike itself and that are not proximately caused by the unlawful conspiracy.

Loss of profits due to wrongful termination of a going business by another is ordinarily established by showing past profits under reasonably similar circumstances, usually during a reasonable period immediately preceding such termination. (See authorities in preceding paragraph.) But where operation of a business is wrongfully prevented under such circumstances that evidence of past profits is not available or may not represent the best measure of the losses suffered by reason of such wrong, such losses may be established by subsequent experience, or other competent evidence such as the experience of others or by opinion evidence. Midland Valley R.R. Co. v. Excelsior Coal Co., 8 Cir., 86 F.2d 177; Excelsior Motor Mfg. & Supply Co.· v. Sound Equipment, 7 Cir., 73 F.2d 725; Julian Petroleum Corporation v. Courtney Petroleum Co., 9 Cir., 22 F. 2d 360.

To avoid further litigation and to dispose of the entire matter, a court of equity may in such case decree that defendants pay all proper damages established · by the evidence · whether such damages accrued before the commencement of · the suit or afterwards, down to· the time of trial. 32 C.J. § 648, pp. 382, 383; City of Harrisonville v. Dickey Clay Mfg. Co., 8 Cir., 61 F.2d 210; Armour & Co. v. Miller, 8 Cir., 91 F.2d 521.

The burden of proof is on the plaintiff to establish the liability of the defendants and each of them for damages suffered by the plaintiff, by a preponderance of the evidence and to produce proof from which the amount of such damages can be determined with a reasonable degree of certainty. Defendants can be held only for damages that proximately resulted from wrongful or unlawful conduct on their part either individually or through

the medium of a wrongful conspiracy. Any damages suffered by plaintiff by reason of its mine being closed solely by reason of the strike of its employees may not be charged to the defendants.

From the evidence it appears that the strike was lawful in its inception on April 1, 1933. Plaintiff made no move toward opening its mine after the beginning of the strike until October, 1933. Quite properly, I think, counsel for plaintiff do not insist that defendants are liable for the losses suffered by the plaintiff during the period between April 1, 1933, and October 19, 1933. The occurrences on and about the latter date will be referred to again.

That there was an unlawful conspiracy in August and September, 1934, with which the defendants were connected which did, in fact, prevent the plaintiff from operating its mine on September 8, 1934, and thereafter, is established by the evidence. Before it was compelled by said conspiracy to close, it had operated its mine part of one day on September 7, 1934, and had demonstrated its capacity, if not interfered with, to operate the mine and produce coal in such substantial quantity with employees who were not members of the Progressive Miners of America as to be able to make a profit in spite of the bad labor conditions with which it had to contend. The plaintiff is entitled to recover any damages shown to have resulted from being compelled by defendants and their coconspirators to close its mine and keep it closed after September 7, 1934, up to the time of the entry of the decree for injunction on January 20, 1936. The evidence clearly shows that the defendants and the others acting with them in August and September, 1934, would have prevented a reopening of the mine at any time subsequent to that date and up to the time the injunction was issued.

Plaintiff strongly insists that it has also, by sufficient evidence, established its right to recover damages suffered by it through its mine remaining closed from October 19, 1933, to September 8, 1934. The evidence relating to the occurrences on or about the 19th of October, 1933, that affected conditions at the mine and upon which plaintiff relies, discloses that of the defendants in this case from whom damages are now sought only the individual defendants Adolph Lucash, Charles Parrish, George Hary, and Irwin Fischer, all former employees, were seen among the pickets at the mine on or about October 19, 1933. There is no evidence, except that of his presence at or near the mine on one of those days, that any one of them was actually participating in or encouraging any acts of violence, threats or intimidation, or was actually present when any such acts took place. Who the other several hundred men and women on the picket line were on those days the record does not show. The finding of the court in the injunction proceeding that they were members of the Progressive Miners of America is founded on inference. There is no evidence of any official action by the district officers of the Progressive Miners of America or any local of that organization in preparation for participation in, or approval of the mass picketing and threatening conduct that took place at the mine in October, 1933, such as is abundantly shown by the evidence to have preceded and accompanied the picketing and violence in August and September, 1934. All that appears from the evidence is that plaintiff planned to reopen the mine on October 19, 1933; that the former employees at the mine were notified by letters mailed by plaintiff on October 17 that the mine would reopen on October 19, 1933; that the sheriff's office refused to agree to keep peace at the mine if it were reopened with United Mine Workers; that George D. Huff, plaintiff's mine manager, on October 18, decided to and did abandon the plan to reopen the mine because he felt that protection would not be received from the county officers; that on October 19, several hundred pickets were in the neighborhood of the mine and some at the mine; that some assumed threatening attitudes with rocks in their hands beside a pile of assembled rocks and one had an iron tie in his hand; that on October 20, forty or fifty men and fifteen women were assembled on the highway near the mine and some of the women obstructed the use of the highway by mine officials; that on the day following, October 21, no pickets were at the mine, but some cars were driven back and forth along the highway and defendant Charles Parrish was recognized in one of the cars; that no attempt was made to operate the mine on any of those days, nor subsequently, until August and September, 1934.

Whether the foregoing facts show the existence of an unlawful conspiracy in October, 1933, with a common unlawful purpose of preventing the reopening of the

mine by threats and violence, or whether the events shown were the spontaneous action of vitally interested men and women who acted as individuals when the word came that the mine would begin work on October 19 with United Mine Workers, as employees, does not appear from the evidence, unless by way of inference.

If, by reason of the mass picketing and concerted action on the picket line and by reason of the threatening conduct of several of the pickets shown by the evidence, an unlawful conspiracy can be said to have existed in October, 1933, which prevented the mine from reopening, I find no satisfactory proof that such conspiracy continued to exist after October 21, 1933; or that it was identical with or a part of the conspiracy which appeared in August and September, 1934, almost a year later. So far as the evidence shows, an entirely different conspiracy caused the closing of the mine in September, 1934. Certainly it was a much larger conspiracy and, so far as the evidence shows, consisted of entirely different people, with the exception of the four individual defendants heretofore named. The conspiracy in August and September, 1934, included all the defendants, was backed by the official action and support of all the defendant unions and by the great bulk of their members, running into the thousands. It was a well-planned and highly organized conspiracy, very different from the apparently unorganized and leaderless mob which functioned in October, 1933.

In my opinion the evidence fails to establish the liability of the defendants for the losses, if any, shown by the evidence to have been suffered by the plaintiff due to the shutdown of the mine between October 19, 1933, and September 7, 1934.

In support of its claim for damages the plaintiff offered evidence that tended to prove (a) lost profits while the mine was closed, (b) necessary shutdown expenses, and (c) the loss of that portion of the general overhead expenses of the corporation which would have been allocated to the Freeburg mine for payment and paid by that mine in proportion to the tonnage produced had it been operating.

As part of its proof to establish its lost profits, plaintiff introduced evidence to show its annual net operating profits for three years prior to the strike and its net operating profit for 1936 from February 11, the day it began operating after the injunc-

tion issued, to December 31, 1936. The net operating profits shown by the evidence for the various years were as follows: 1930, $97,748.68; 1931, $145,074.17; 1932, $88,270.78; 1933, January, February and March, $12,756.98; 1936, February 11 to December 31, $46,863.62.

Plaintiff insists that the net earnings of the mine during the years before the strike, as shown by the evidence, should be used to measure its lost profits during the shutdown due to the wrongful conduct of defendants. I am of the opinion that under the peculiar facts in this case the profits lost during the period from September 7, 1934, to January 20, 1936, can be estimated and found with that reasonable degree of certainty necessary for the recovery of lost profits only by using the 1936 profits as a measure. It must not be lost sight of that the shutdown of the mine in its inception was caused by a lawful strike; that such shutdown began April 1, 1933, and continued to September 7, 1934, through a period for which the defendants cannot be held in damages. The evidence shows that preceding the strike the mine had been operated by experienced employees through whom the plaintiff was able to secure maximum production. The evidence further shows that plaintiff had profitable contracts up to the time of the strike and that the mine and equipment were all in first class operating condition. So far as the evidence shows, the aforesaid contracts were lost immediately following the strike, were not available when the mine reopened in 1936, and would not have been had the mine been permitted to continue to operate following September 7, 1934. The evidence further shows that the labor conditions which confronted the plaintiff when it resumed operation in February, 1936, were unfavorable and much time and labor had to be expended in putting the mine into condition to operate at maximum production. These conditions did not exist before April, 1933, but did exist and would have had to be contended with in September, 1934. The evidence further shows that the conditions of the market and the demand for coal in 1936 was not greatly different from the conditions of the market and the demand for coal in 1934 and 1935. From all these considerations, it seems reasonable that the net operating profits realized by the plaintiffs, following the reopening of the mine in 1936 as shown by the evidence, rather than the profits realized preceding the strike, should be used as

a measuring rod of its lost profits by reason of being shut down from September, 1934, to January, 1936.

The net operating profit of the mine during the approximately ten and one-half months it operated in 1936 having been $46,863.62, the lost profits during the period from September 7, 1934, to January 20, 1936, are fairly represented, in my judgment, by the sum of $70,000 and I find them in that amount.

■ In arriving at the amount of the operating profit realized at the mine from February, 1936, to December 31, 1936, as shown by the evidence, plaintiff deducted from total sales ($289,283.54) the cost of labor ($87,346.71), supplies and other operating costs ($60,632.80), and cost of selling ($19,574). It also deducted item designated, "Fixed charges and General Expenses," amounting to $19,390.27, made up of a portion of plaintiff's 1936 general overhead expenses such as officers' salaries and expenses, general office and clerical expenses, and other general expenses which were allocated to the Red Ray Mine in proportion to the tonnage it produced as compared with plaintiff's other mines. A further item of $55,476.14, entitled "Depletion and Depreciation," was deducted, leaving the net balance of $46,863.62 as net operating profit for the period in question. When the foregoing method used by plaintiff in calculating its net profits is analyzed and consideration is given the evidence that the general overhead expense represented by the itm of "Fixed Charges and General Expenses" was continuing expense that had to be paid by the plaintiff whether the Red Ray Mine operated or not, it becomes apparent that the net operating profit of $46,863.62 so arrived at, having been used as the standard of measurement of lost profits during the period the mine was closed, plaintiff is entitled to have the item of "Fixed Charges and General Expenses" considered as evidence of the amount of the general expense paid by plaintiff that would have been allocated to the Red Ray Mine and paid from its earnings during the same period had the mine operated. Accordingly, from the evidence, I have arrived at and fixed upon the sum of $22,000 as the damages suffered by plaintiff on account of loss by reason of necessary general overhead expenses paid by plaintiff during the period from September 7, 1934, to January 20, 1936, that would have been paid from the earnings of the Red Ray Mine had it operated during that period.

The evidence shows the plaintiff necessarily incurred and paid a heavy shutdown expense at the mine during the time the mine was closed from September 7, 1934, to January 20, 1936, that would have been saved to plaintiff had it been permitted to operate the mine. From the evidence, I fix this item of damages at the sum of $25,000.

In arriving at each of the foregoing items of reasonable damages, I have made allowance in defendants' favor to care for any probable variance in their favor resulting from the application of the standards of measurement used to a period of time different from the period which produced the standards.

■ Plaintiff also claims a right to exemplary damages and to interest at the legal rate of 5 per cent. on all sums found as damages from the time the plaintiff became deprived of same. Both claims are denied.

The total of the damages caused to the plaintiff by the wrongful conduct of the defendants is found to be and fixed at the sum of $117,000. Counsel for plaintiff may present decree accordingly.

### On Motion for Rehearing.

In the motion for rehearing counsel have not questioned the basic principles on which the decree for plaintiff is founded, but have strongly questioned some of the findings of fact and, in certain respects, the measure of damages applied by the court. I will notice the contentions that have not been pressed heretofore.

■ It is urged that the profits shown by the evidence to have been lost during the shutdown of the mine due to defendants' wrong may not properly be assessed as damages against the defendants; that plaintiff's damages based upon lost profits should be measured by the loss of interest at legal rate upon such profits for the time the plaintiff was wrongfully deprived of the use of the mine and thus delayed in realizing and having use of such profits. This contention is bottomed upon the theory that since the lost profits were calculated upon the mining and sale of coal that was not actually removed, the profits were not lost but merely postponed for the period of the wrongful shutdown. In support of their contention defendants cite Hoogendorn v. Daniel, 9 Cir., 202 F. 431; McCornick v. United States Mining Co., 8 Cir., 185 F. 748; Carter v. Cairo, Vincennes & Chicago

Ry. Co., 145 Ill.App. 653, affirmed 240 Ill. 152, 88 N.E. 493; Newark Coal Co. v. Upson, 40 Ohio St. 17; Bradford Oil Co. v. Blair, 113 Pa. 83, 4 A. 218, 57 Am.Rep. 442.

In the two federal cases cited the rule contended for seems to be recognized. In neither was the rule applied by the court in this case advanced or considered. The other cases bear but indirectly upon the question. Time and space will not be taken to discuss the facts involved in those cases. In none were the facts similar to those in the case before the court.

Here plaintiff held by deed and by lease a large acreage of proved coal lands sufficient to keep it working in production over a period of years. It had a large investment in heavy machinery and equipment suitable for operating a strip mine with a heavy overburden. It had a ready market for its coal and could obtain a continuous return upon its investment only by mining and marketing the coal continuously so as to keep its necessary capital at work. For the period the mine was shut down the plaintiff lost its return upon the entire investment in mine, machinery, and equipment. It suffered heavy losses through the depreciation of its machinery and equipment while they were lying idle, exposed to the weather; also injury and damage to its mine resulting from water, erosion and slides.

The plaintiff's losses enumerated in the foregoing paragraph could not be compensated for by an allowance of interest upon lost profits during the period of the wrongful shutdown. When capital investments, including machinery and equipment subject to depreciation, are involved, time is valuable and costly just as it is when personal services are involved. Earnings upon an investment lost through wrongfully enforced idleness can never be recovered through subsequent earnings any more than a wasted hour can be recalled for subsequent use. Depreciation of machinery and equipment not balanced by contemporary earnings represents a present and not a postponed loss. Where there is a 'large capital investment, as here, the fact that the coal remained in the ground is not a controlling factor, particularly where there is sufficient other coal to keep the capital working over a substantial period of time. Then, too, in arriving at the net lost profits here the value of the coal in place was figured out of the gross profits under the item of depletion. Whether it can be mined

at some future time, after plaintiff has exhausted its other coal, at a net profit that will fairly compensate plaintiff for its then required use of its capital investment and also for its losses suffered through its enforced idleness during the period in question, as shown by the evidence, takes one into the realm of pure speculation.

Mature consideration of the problem confirms my conviction that under the circumstances here, the net profits lost by the plaintiff during the period of the shutdown caused by defendants' wrong is a proper element to be included in an equitable and fair assessment of the damages suffered by the plaintiff. This seems to be in harmony with the principles applied in similar cases by state and federal courts alike as will appear from the following decisions: Midland Valley R. R. Co. v. Excelsior Coal Co., 8 Cir., 86 F.2d 177; Julian Petroleum Corporation v. Courtney Petroleum Co., 9 Cir., 22 F.2d 360; Berwind-White Coal Mining Co. v. Martin, 3 Cir., 124 F. 313, certiorari denied 191 U.S. 569, 24 S.Ct. 841, 48 L.Ed. 306; Daughetee v. Ohio Oil Co., 263 Ill. 518, 105 N.E 308; Stoddard v. Illinois Improvement Co., 275 Ill. 199, 113 N. E. 913; Texas Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.2d 1031, 60 A.L.R. 936; Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890; American Sulphur Royalty Co. v. Freeport Sulphur Co., Tex.Civ.App., 276 S.W. 448; Paul v. Cragnaz, 25 Nev. 293, 59 P. 857, 60 P. 983, 47 L.R.A. 540.

Defendants contend that the earnings of the mine during the ten and one-half months in 1936, immediately following its reopening, is not a fair measure of the earnings it would have produced from September 7, 1934, to January 20, 1936. Undoubtedly, it is not an exact measure. Yet it was the best that could be made available. As applied in assessing plaintiff's damages, it was more than fair to the defendants. It satisfactorily appears from the evidence that there was at all times a market upon which the coal from this mine, in view of its low production cost, could have been sold profitably in competition with other coal of the same quality having the same freight rate. The substantial profit made by the mine in the hardest year, 1932, fairly demonstrates this. Any probable variances in earnings between the period in question and 1936, if unfavorable to defendants, were more than compensated for

by the elimination of several substantial elements of loss suffered by plaintiff. No allowances were made plaintiff by reason of the facts that the cost of reopening the mine in the favorable weather of September, 1934, would have been much less than the cost of reopening sixteen months later in dead of winter in January and February, 1936; that the injury to mine, machinery, and equipment had increased during the delay; that the beginning of the good coal sales season in October, 1934, would have been a more favorable time to reestablish a market and advance quickly into full production than was the mid-season of 1936 when, as shown by the evidence, the best season for sales had passed before the market could be reestablished and normal production resumed; that if the mine had been reopened in September, 1934, it would have been in full production on January 20, 1936, with market reestablished so that the production and profits for 1936, beginning on January 20 instead of February 11, would have been increased. Basing plaintiff's damages on 1936 net profits results in the cost of reopening the mine and reestablishing the market being twice figured off plaintiff's profits instead of once as would have been the fact if the mine had been permitted to reopen in September, 1934. Other elements of loss similar in nature to the foregoing were considered, but all were merged in the item of $70,000, designated as lost profits, which, in fact, is less than the amount that would have been earned during the period in question measured on the basis of the 1936 net profits.

Defendants' argument that labor conditions were less favorable to plaintiff's successful operation in September, 1934, than in January, 1936, is not sustained by the evidence. The same bitter dispute between the contending unions was raging at both times. It stands to reason that more of the former employees of the mine had found employment elsewhere by January, 1936, than by September,. 1934. As early as September and October, 1933, a substantial number had shown themselves anxious to work by signing a petition to secure a provisional local of United Mine Workers so the mine could be reopened. With fear of defendants' violence removed from the minds of those otherwise ready and willing to go to work for plaintiff in September, 1934, labor would undoubtedly have been available then to operate the mine as economically and as well as in 1936. In con-sidering the small production on September 7, 1934, it should not be overlooked that the mine was operated but part of a day and in face of the certainty that defendants would quickly descend upon the mine in full force and with violence. Not only were their worst fears realized the following day as abundantly shown by the evidence, but sufficient evidence appears in the record to bring conviction that the same threat hung over the mine continuously from September 7, 1934, to January 20, 1936, when the injunction was issued, thus effectively preventing the reopening of the mine before the latter date.

Defendants contend that the portion of plaintiff's general overhead properly allocable to this mine during the period of the shutdown cannot be determined from the record for the reason that the record does not disclose the tonnage produced at plaintiff's other mines nor the amount of plaintiff's general overhead during the period in question. It is true that this mine's proper share of such general overhead, assuming that during such period it would have produced proportionately the same tonnage that it produced in 1936, is dependent upon the tonnage produced at the other mines and upon the amount of plaintiff's actual general overhead during the same period. It is also true that the record does not disclose such tonnage nor such general overhead in so many figures. But an inspection of the exhibits introduced by plaintiff in which is shown the portion of the general overhead attributable to this mine for the entire period of the shutdown, broken up into years, on a basis of the production of the mine in 1932 of 239,000 tons, discloses that the actual tonnage produced at the other mines and the actual general overhead of the plaintiff expended during the period in question are both reflected in the calculations. The books of the plaintiff showing such tonnage and expenses, from which the exhibits were made up, were in court. The witnesses who made up the exhibits from the books were cross-examined, and by agreement of counsel the books themselves were not introduced in evidence. Accepting the figures in those exhibits as true, it is not difficult to determine with approximate accuracy the amount of general overhead attributable to the Freeburg mine for the period in question on a tonnage estimated as proportionately the same as that actually produced in 1936. The tonnage produced in 1936 calculated on an annual basis was

but slightly less than the tonnage in 1932, and it will be seen that the general overhead expense properly attributable to the Free-burg mine during the period in question was substantially more than the $22,000 allowed by the court.

The position taken by defendants' counsel in regard to defendants' liability for necessary shutdown expenses actually paid out by plaintiff during the period the mine was kept closed, in my judgment, is not tenable.

A review of the evidence has led me to believe that liability for damages has not been established against the defendants Local Unions Nos. 76 and 89 of District No. 1, Progressive Miners òf America.

The defendants' motion for a rehearing must be and is hereby denied except as to defendants Local Unions Nos. 76 and 89 of District 1, Progressive Miners of America, and as to them the judgment for damages is set aside. Counsel for plaintiff will present order pursuant hereto in open court at East St. Louis, Illinois, on February 23, 1938, at 9:30 a. m.